994 P.2d 591

In the Matter of the Tax Appeal of GRACE BUSINESS DEVELOPMENT CORPORATION, Plaintiff–Appellant,

v.

Ray K. KAMIKAWA, Director of Taxation, State of Hawaii, Defendant–Appellee.

No. 22028.

Intermediate Court of Appeals of Hawai'i.

Oct. 29, 1999.

Certiorari Granted Dec. 8, 1999.

Steven L. Rinesmith, Roger S. Moseley, and Cathy Lee Sekiguchi, on the briefs, Honolulu, for plaintiff-appellant.

Eric S.T. Young, Honolulu, and Michael H. Hosokawa, on the briefs, for defendant-appellee.

BURNS, C.J., ACOBA, and LIM, JJ.

Opinion of the Court by LIM, J.

Plaintiff–Appellant Grace Business Development Corporation (Grace) appeals from the Judgment of the Tax Appeal Court, dismissing for lack of jurisdiction Grace's Complaint for Refund of Taxes, and Declaratory Judgment and Injunctive Relief, and from its underlying order granting the motion to dismiss filed by Defendant–Appellee Ray K. Kamikawa, Director of Taxation, State of Hawai'i (the Director or the State), and denying Grace's motion for summary judgment.

We reverse the Tax Appeal Court's dismissal of Grace's claim for refund of the taxes it paid under protest pursuant to Hawai'i Revised Statutes (HRS) § 40–35 (1993), and in doing so hold, on the record before us in this particular case, that the Tax Appeal Court had subject matter jurisdiction thereunder, the lack of official assessment or denial of refund notwithstanding.

We affirm the Tax Appeal Court's dismissal of Grace's claims for declaratory and injunctive relief. With respect to Grace's prayer for declaratory relief, we hold that a "controversy with respect to taxes," by any other name, is still a "controversy with respect to taxes" in which a declaratory judgment is precluded by HRS § 632–1.

## I. BACKGROUND

On December 11, 1996, Grace filed Articles of Incorporation as a business development corporation (BDC) under HRS chapter 420.

On April 24, 1997, Grace took over operation of the Nimitz Holiday Inn and the Best Western Plaza Hotel, hotels near the Honolulu International Airport, under a licensing agreement with owner and previous operator Nimitz Partners.

Chapter 420, originally promulgated in 1957, authorized the creation of BDCs "for the purpose of promoting, developing, and advancing the prosperity and economic welfare of the Pacific Islands[.]" HRS § 420–2(a) (Supp.1998). More fully stated,

[t]he purposes of the corporation shall be to promote, stimulate, develop, and advance the business prosperity and economic welfare of the Pacific Islands and their citizens; to encourage and assist through loans, investments, or other business transactions, in the location of new business and industry in the Pacific Islands and to rehabilitate and assist existing business and industry; and so to stimulate and assist in the expansion of all kinds of business activity which will tend to promote the business development and maintain the economic stability of the Pacific Islands, provide maximum opportunities for employment, encourage thrift, and improve the standard of living of the citizens of the Pacific Islands; similarly, to cooperate and act in conjunction with other organizations, public or private, in the promotion and advancement of industrial, commercial, agricultural, and recreational developments in the Pacific Islands, and to provide financing for the promotion, development, and conduct of all kinds of business activity in the Pacific Islands.

HRS § 420–2(a)(3).

In aid of these purposes, chapter 420 conferred various powers upon BDCs, including, among others, the power to borrow and lend money, the power to buy, hold, sell and otherwise dispose of real, personal and intangible property, the power to hypothecate, and the power to assume and guarantee obligations, all in addition to those powers en-

joyed by business corporations under the general corporation laws. HRS § 420–2(b).

To encourage BDCs in such endeavors, chapter 420 exempted them from certain state taxes, including those "based upon and measured by income[.]" HRS § 420–16.

Taxes based upon and measured by income include the general excise/use tax (GET) and the transient accommodations tax (TAT). HRS chapters 237–238 (1993 and Supp.1998).

Reportedly, relatively few companies have taken advantage of the law since its inception in 1957. Grace is one of a small rash of recent incorporations. These BDCs are active business enterprises of various sorts, as opposed to privately financed credit corporations.

Before Grace's debut as operator, the hotels had filed GET and TAT returns and paid the applicable levies. However, as soon as Grace commenced operations, it discontinued such filings and payments, while continuing compliance with respect to other requirements, such as payroll reporting and taxes.

On October 17, 1997, the Director issued Tax Information Release (TIR) No. 97–5 "in response to recent publicity about certain persons who have incorporated [BDCs]...." TIR No. 97–5 purported to explain "the proper interpretation of the law regarding BDCs and associated tax benefits":

> Chapter 420 ... was enacted to permit the establishment of privately financed credit corporations which would make available medium and long-term capital in the form of loans and investments. The BDCs were given powers to accomplish the purpose of making capital available to small and medium size business entities.
>
> The loans made by a BDC to business entities may only be made after the business entity has applied for a loan through ordinary banking channels and the loan applied for was refused by at least one bank or other financial institution.
>
> Substantial tax benefits are offered to BDCs because of the significant business risk they undertake by providing loans to struggling businesses or financing industrial businesses ... which will provide many jobs.
>
> BDCs may not be formed for the purpose of conducting active business enterprises, such as movie theaters, management consulting services, and retailing. The Department will challenge any tax benefits claimed for BDCs formed or operated for these and any other purposes not within the design and intent of the law.

According to the deposition testimony of one Department of Taxation (the Department) employee, TIR No. 97–5 signaled a sea change in the Department's policy with respect to BDC tax exemptions. Before the issuance of TIR No. 97–5, BDCs were to be afforded the exemptions solely by virtue of incorporation under chapter 420. After its issuance, the emphatic distinction between privately financed credit corporations and active business enterprises obtained.

On December 10, 1997, a taxation compliance administrator with the Department sent Grace a letter noting its status as a BDC, advising it of the issuance of TIR No. 97–5, and enclosing a copy thereof.

By letter dated December 19, 1997, the Department notified Grace it was commencing an audit of its operations with respect to all taxes administered by the Department.

Grace freely admits it is not a privately financed credit corporation, but rather an active business enterprise operating hotels under a license agreement.

On January 20, 1998, Grace filed a GET return and a TAT return, both for the month of April 1997, and paid the applicable taxes, but under protest pursuant to HRS § 40–35, stating:

> It is Grace's position that because it is a valid [BDC] lawfully formed pursuant to HRS [C]hapter 420, it is not subject to Hawaii general excise taxes or transient accommodations taxes. It is also Grace's position that as a[BDC] it is not obligated to report its gross income on, or file, general excise tax returns or transient accommodations tax returns.

HRS § 40–35 provides, in pertinent part:

> (a) Any disputed portion of moneys representing a claim in favor of the State may be paid under protest to a public accoun-

tant of the department, board, bureau, commission, or other agency of the State with which the claimant has the dispute. The protest shall be in writing, signed by the person making the payment, or by the person's agent, and shall set forth the grounds of protest. If any payment, or any portion of any payment, is made under protest, the public accountant to whom the payment is made shall hold that portion of the moneys paid under protest in a trust account in the state treasury for a period of thirty days from the date of payment.

(b) Action to recover moneys paid under protest or proceedings to adjust the claim may be commenced by the payer or claimant against the public accountant to whom the payment was made, in a court of competent jurisdiction, within thirty days from the date of payment. If no suit or proceeding is brought within the thirty-day period, the money paid under protest shall be deposited into the appropriate account in the treasury of the State by the accountant and the amount deposited shall thereupon become a government realization. Any action to recover payment of taxes under protest shall be commenced in the tax appeal court.

On January 23, 1998, Grace filed in the Tax Appeal Court its Complaint for Refund of Taxes, and Declaratory Judgment and Injunctive Relief against the Director, seeking, in pertinent part, (1) refund of the taxes it paid under protest, (2) judgment declaring that Grace is a BDC within the meaning of chapter 420 and therefore exempt from the GET and the TAT, (3) judgment declaring that TIR No. 97–5 is invalid and unenforceable in that it is an agency rule adopted without compliance with chapter 91, and (4) an injunction against audit and collection by the Department.

Thereafter, the 1998 Legislature passed Act 157, § 5, repealing chapter 420 effective December 31, 2001, and gradually eliminating in the interim its tax exemption on a four-year sliding scale. 1998 Haw. Sess. L., Act 157 § 5, at 596–97.

On May 21, 1998, the Director issued TIR No. 98–3, which reiterated the Department's intent to challenge and disallow chapter 420

tax exemptions for "operating business activities."

On May 26, 1998, The Honolulu Advertiser headlined its "Business" section with an article about BDCs and their impending demise. The article featured several quotes from the Director. One warned that "we haven't found one BDC that fulfills the purposes of the BDC law, ... so we're going to disallow their exemptions immediately, without any regard to the phase-out schedule." Another asserted that a " 'Company C,' which is in the hotel industry, has avoided paying $520,000 in [GETs] and $690,000 in [TATs]." Though the Director declined to name specific BDCs, the article further noted public documents identifying Grace as a BDC which owns the Plaza Hotel. These two instances were the only mention of a hotel BDC in the article. The deposition testimony of a Department employee confirms that Grace was "Company C."

The record below indicates that, on March 24, 1998, the Department had estimated annual tax losses due to Grace's chapter 420 exemption to be $722,949 GET and $693,794 TAT. A proposed assessment prepared by the Department for 1997 totaled $1,151,-909.80.

On July 17, 1998, Grace filed its motion for summary judgment for the declaratory and refund relief prayed for in its Complaint. In support, Grace argued, *inter alia*, that the plain language of chapter 420 encompasses active business enterprises as well as privately financed credit corporations. In so arguing, Grace emphasized the business purposes beyond financing permitted by the law, "to encourage and assist through loans, investments, *or other business transactions*," HRS § 420–2(a)(3) (emphasis added), and the multifarious powers enjoyed by BDCs under HRS § 420–2(b).

Simultaneously, the Director filed his motion to dismiss, alleging a failure to state a viable cause of action. The Director's main arguments in support may be summarized as follows.

As to Grace's refund request, the Director argued that the Tax Appeal Court lacked jurisdiction under the general tax appeal

statutes, *see* chapter 232, because there was no assessment extant permitting appeal to the Tax Appeal Court. The Director argued further that the tax appeal court lacked jurisdiction under HRS § 40–35, because that statute applies only to a "disputed portion of moneys representing a claim in favor of the State[,]" HRS § 40–35(a), interpreting the phrase to mean a disputed formal assessment, or denial of refund, made by the Department.

With respect to Grace's prayer for declaratory relief, the Director invoked HRS § 632–1, precluding declaratory relief in any controversy with respect to taxes.

Finally, with respect to Grace's application for an injunction, the Director raised the special jurisdiction of the Tax Appeal Court as a bar to its exercise of powers in general matters of equity.

The respective arguments of the parties remained basically the same throughout the various memoranda in opposition, reply memoranda and supplemental submittals, save for minor elaborations and the obligatory naysaying.

Along the way, Grace conceded the Tax Appeal Court lacked subject matter jurisdiction under chapter 232. It also acknowledged that its prayer for injunctive relief was moot.

On August 11, 1998, the Tax Appeal Court heard, at the same time, Grace's motion for summary judgment and the Director's motion to dismiss. After argument, the court stated the following:

> I guess technically speaking, looking at this from a common sense point of view, you obviously have your answer as to what the State is going to do in this case and I think we have an implicit adverse decision if you want to look at it in that sense, but I'm being—I think the only thing that I can see that you both agree on is that you want to be technical.
>
> You want me to construe the law and the statutes involved—I mean, the case law, and the statutes that are involved in a very technical way. And I think I have to tend to agree that I need to do it in this situation. And so accordingly, for the reasons

set forth in the motions—motion by the State, I believe that there is a technical defect at this point in time in your appeal.

> And accordingly, the Directors (sic) of Taxation's motion to dismiss is granted.... The appellant's motion for summary judgment is denied and just let me make a comment that obviously, I think it would have been much more appropriate and much more economical and much more practical to have just ruled on the motion for summary judgment, but so be it....

The October 2, 1998 order issuing out of the hearing stated the grounds for decision as follows:

> Director's Motion to Dismiss is granted on the ground that the Tax Appeal Court lacks jurisdiction over this case because (1) [Grace] has not met the disputed claim or assessment requirements for an appeal to this court under HRS §§ 40–35, or 232–11, (2) HRS § 632–1 prohibits declaratory relief in any controversy with respect to taxes, and (3) [Grace] has advanced no grounds for injunctive relief. For the same reasons, [Grace]'s Motion for Summary Judgment is denied.

The Judgment of even date adopted the same operative findings.

This timely appeal followed on November 2, 1998.

The Department has yet to make a formal assessment of the taxes in question. It has not administratively denied Grace's refund request. It has made no formal claim of any kind for the taxes in question. The State asserts that any decision regarding official exaction must await completion of its audit of Grace. Grace complains that any delay in resolution of this dispute mires it in financial uncertainty.

## II. ISSUES PRESENTED

Grace presents the following questions on appeal:

A. Whether or not the Tax Appeal Court lacked jurisdiction over Grace's claim for refund brought pursuant to HRS § 40–35?

Whether or not HRS § 40–35 requires an assessment or demand for payment by the

State of a specific amount of taxes as a technical precondition to a claim by a taxpayer for refund of payment made under protest?

B. Whether or not the Tax Appeal Court lacked jurisdiction over Grace's action for declaratory relief brought pursuant to HRS § 632–1?

Whether or not Grace's action for declaratory relief sought a determination that it was a valid [BDC] rather than a determination of a controversy with respect to taxes?

## III. STANDARDS OF REVIEW

■ The parties do not dispute the material facts giving rise to this appeal; their dispute is over the interpretation of HRS §§ 40–35 and 632–1. Where the facts are undisputed and the sole question is a question of law, the decision of the Tax Appeal Court is reviewed under the right/wrong standard. *Kamikawa v. Lynden Air Freight, Inc.,* 89 Hawai'i 51, 54, 968 P.2d 653, 656 (1998). The interpretation of a statute is a question of law. *Maile Sky v. City & County of Honolulu,* 85 Hawai'i 36, 39, 936 P.2d 672, 675 (1997).

## IV. DISCUSSION

The common law took a rather austere view of actions against the government involving disputes over the validity or amount of taxes.

Common law actions for refund were not permitted for simple mistake, either as to the applicability of a particular tax, or in calculation of the amount of taxes due. Action to heal self-inflicted tax injury was available only by grace of the sovereign embodied in special statute. 72 Am.Jur.2d *State and Local Taxation* § 1074, at 337 (1974).

Policy extruded other forms of redress. The common law proscribed injunctions against collection of illegal taxes because of concerns about wholesale disruption of public revenue and budget. As more delicately put, "Usually preventive remedies are discountenanced as embarrassing to the just operations of the government, and the party taxed is required to pay the tax and seek redress in an action of assumpsit against the collector for money had and received." *State Tonnage Tax Cases,* 79 U.S. (12 Wallace) 204, 223 (1870); *see also, Atchison, Topeka & Santa Fe Railway Company v. O'Connor,* 223 U.S. 280, 285, 32 S.Ct. 216, 56 L.Ed. 436 (1912).

Such concerns necessarily confined common law tax actions to refund actions. *State Tonnage Tax Cases,* 79 U.S. (12 Wallace) at 209 ("Assumpsit for money had and received is an appropriate remedy to recover back moneys illegally exacted by a collector in all jurisdictions where no other remedy is given. . . .") The spectre of hordes of recalcitrant taxpayers withholding payment pending judicial resolution underlay the prepayment condition. *See, e.g., McKesson Corporation v. Division of Alcoholic Beverages and Tobacco,* 496 U.S. 18, 45, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990).

There being no valid contract between sovereign and taxpayer, the common law tax refund action sounded in equity, kin to the action for unjust enrichment. Denominated "indebitatus assumpsit for money had and received," it partook of the equitable spirit of restitution and general remediation. *Stone v. White,* 301 U.S. 532, 534, 57 S.Ct. 851, 81 L.Ed. 1265 (1937). As Justice Stone intoned:

The action, brought to recover a tax erroneously paid, although an action at law, is equitable in its function. It is the lineal successor of the common count in *indebitatus assumpsit* for money had and received. Originally an action for the recovery of debt, favored because more convenient and flexible than the common law action of debt, it has been gradually expanded as a medium for recovery upon every form of quasi-contractual obligation in which the duty to pay money is imposed by law, independently of contract, express or implied in fact (citations omitted).

Its use to recover upon rights equitable in nature to avoid unjust enrichment by the defendant at the expense of the plaintiff, and its control in every case by equitable principles, established by Lord Mans-

field ... have long been recognized in this Court (citations omitted).

*Id.*

Even where taxes were collected wrongfully or illegally, however, nonsuit of a common law tax refund action would result if the taxes were paid voluntarily. *Little v. Bowers,* 134 U.S. 547, 554, 10 S.Ct. 620, 33 L.Ed. 1016 (1890). The material element of involuntariness went beyond mere unwillingness. *Id.* ("And the fact that the party, at the time of making the payment, files a written protest does not make the payment involuntary.") The common law involuntary payment principle required that unwarranted payment be induced by a duress on the order of seizure of assets, *id.* at 556, 10 S.Ct. 620, or loss of license to do business, *Atchison,* 223 U.S. at 286, 32 S.Ct. 216, immediately attendant upon a refusal to remit. In determining whether a certain degree of duress rendered payment involuntary, official exaction was deemed significant:

> When the duress has been exerted by one clothed with official authority, or exercising a public employment, less evidence of compulsion or pressure is required,—as where an officer exacts illegal fees, or a common carrier excessive charges. But the principle is applicable in all cases according to the nature and exigency of each.

*Robertson v. Frank Brothers Co.,* 132 U.S. 17, 23, 10 S.Ct. 5, 33 L.Ed. 236 (1889).

Given this elemental focus on the conduct of public officials and how it impinged upon the taxpayer, it is not surprising that the common law tax refund action sounded faintly in tort.

Indeed, tantalizing hints appear in the old cases limning a distinction between refund actions for a portion paid, where, for example, an assessment is erroneously calculated; as against refund actions for the whole amount paid, where the taxation itself is held invalid; the latter being characterized under the tort of trespass: "Decided cases may also be referred to where it is held that trespass will lie against the assessor, if it appear that the whole tax was levied without authority, as in that state of the case it is held that the assessor had no jurisdiction of the subject matter." *State Tonnage Tax Cases,* 79 U.S. (12 Wallace) at 223.

Given its manifold facets, the common law tax refund action gave off a curious savour, an uneasy admixture of public finance policy, remediation and official overreaching, one perhaps not fully or clearly understood.

One thing was clear, however, about the common law tax refund action. Official exaction, be it assessment, refusal of refund, or other demand by the government, was virtually elemental. Otherwise, the action in most cases lacked the imminent duress required under the involuntary payment principle. At common law, then, few tax refund actions could survive absent official exaction.

Judicial rigor appeared to ameliorate, however, over time. In a case involving a continuing fine and loss of business license in default of payment, Justice Holmes observed:

> It is reasonable that a man who denies the legality of a tax should have a clear and certain remedy. The rules being established that apart from special circumstances he cannot interfere by injunction with the State's collection of its revenues, an action at law to recover back what he has paid is the alternative left. Of course we are speaking of those cases where the State is not put to an action if the citizen refuses to pay. In these latter he can interpose his objections by way of defence, but when, as is common, the State has a more summary remedy, such as distress, and the party indicates by protest that he is yielding to what he cannot prevent, courts sometimes perhaps have been a little too slow to recognize the implied duress under which payment is made. But even if the State is driven to an action, if at the same time the citizen is put at a serious disadvantage in the assertion of his legal, in this case of his constitutional, rights, by defence in the suit, justice may require that he should be at liberty to avoid those disadvantages by paying promptly and bringing suit on his side. He is entitled to assert his supposed right on reasonably equal terms.

*Atchison,* 223 U.S. at 285–86, 32 S.Ct. 216.

This case was also remarkable in its appreciation of the business duress inherent in

unresolved tax disputes. Again, Justice Holmes:

> In this case the law, beside giving an action of debt to the State, provides that every corporation that fails to pay the tax shall forfeit its right to do business within the State until the tax is paid, and also shall pay a penalty of ten per cent.... It may be that the forfeiture of the right to do business would not be authoritatively established except by a *quo warranto* ..., but before or without the proceeding the effect of the forfeiture clause upon the plaintiff's subsequent contracts and business might be serious ..., and in any event the penalty would go on accruing.... As appears from the decision below, the plaintiff could have had no certainty of ultimate success, and we are of opinion that it was not called upon to take the risk of having its contracts disputed and its business injured and of finding the tax more or less nearly doubled in case it finally had to pay. In other words, we are of opinion that the payment was made under duress.

*Id.*, at 286–87, 32 S.Ct. 216 (citation omitted).

And so it was, in 1906, in Hawai'i. Tax disputes proceeded to litigation by way of common law assumpsit after payment under protest. "The action is based on the theory of an implied promise to pay back moneys illegally demanded and paid under compulsion." *Seattle B. & M. Co. v. Campbell*, 17 Haw. 364, 366, 1906 WL 1308 (1906). Voluntary payment barred recovery, and so was implied the condition precedent of official exaction. "There can be no recovery if the demand was legal though the payment was compulsory, nor if the payment was voluntary though the demand was illegal." *Id.* And judicial rigor in the common law action ameliorated with the evolving economy:

> [T]he mere fact that the money was paid under protest would not authorize a recovery; nor would the mere fact that it was paid unwillingly or reluctantly. It is essential that it should have been paid under compulsion or duress within the meaning of the law of involuntary payments. Perhaps the same degree of duress would not be required as would be required for the purpose of setting aside a conveyance, the execution of which was alleged to have been procured by duress. Probably also forms of compulsion would be considered sufficient under present conditions of commercial activity which would not have been considered sufficient at some earlier periods.

*Id.* at 372.

" 'When such duress is exerted under circumstances sufficient to influence the apprehensions and conduct of a prudent business man, payment of money wrongfully induced thereby ought not to be regarded as voluntary.' " *Id.* at 373 (quoting *Robertson*, 132 U.S. at 17, 10 S.Ct. 5).

A year later, in 1907, the original HRS § 40–35 was enacted. Substantially identical to the instant statute, it jettisoned entirely the common law requirement of involuntary payment under duress; suit depended only upon a payment under protest. Whether this, in turn, rendered official exaction nugatory remains unclear. The legislative history includes the word "claimed," but the process envisioned seems remarkably two-sided, even collegial:

> Section 1521 of the Revised Laws is a portion of Chapter 104 relates to the audit of public accounts, and the proposed Bill under consideration is to provide for a contingency which sometimes occurs and for which no provision is made. It sometimes happens that differences of opinion arise between the Treasurer of the Territory and Citizens in regard to the amount which may be due the Government, especially in regard to the amount of fees to be paid under the statutes. Sometimes the simplest and most direct way to settle such a controversy is for the Citizen to pay the amount claimed under protest and then either by an agreed statement of facts, or an action at law, to submit the matter for judicial decision.

Comm. Rep. no. 72 in 1907 Senate Journal, at 451–52. Certainly, the phrase "differences of opinion," without more, encompasses situations far more prospective and speculative than the one at issue here.

In any event, in leaving the involuntary payment rule by the roadside, the 1907 legislature at least demonstrated its consonance with the evolving judicial attitude of allowance respecting tax refund actions, and the prevailing treatment of such statutes as equitable in nature: "The statutes authorizing tax refunds and suits for their recovery are predicated upon the same equitable principles that underlie an action in assumpsit for money had and received." *Stone,* 301 U.S. at 535, 57 S.Ct. 851.

The common law decreed that, he who pays his taxes voluntarily, pays irrevocably, the equities of the situation notwithstanding. With the advent of statute, it seems, the equities prevailed.

In later tax cases, Hawai'i courts have taken a generally expansive approach, which appears to originate in "equity," by definition:

> Justice administered according to fairness as contrasted with the strictly formulated rules of common law. It is based on a system of rules and principles which originated in England as an alternative to the harsh rules of common law and which were based on what was fair in a particular situation.... The term "equity" denotes the spirit and habit of fairness, justness, and right dealing which would regulate the intercourse of men with men.

*Black's Law Dictionary* 540 (6th ed.1990).

In particular, Hawai'i courts have consistently taken an expansive view of their jurisdiction to hear tax disputes, at least where the State's financial interests have been secured pending resolution, by prior payment of the amount in dispute.

*In re Tax Appeal of Aloha Motors, Inc.,* 69 Haw. 515, 750 P.2d 81 (1988), the taxpayer had erroneously paid duplicative wholesale use taxes from 1968 to 1981. Upon realizing its error in 1981, the taxpayer requested refund of the erroneous tax payments, but the State refused all but those amounts which were still within the statute of limitations. The Tax Appeal Court dismissed taxpayer's suit for the refused amounts, holding that it lacked jurisdiction, and that the stat-ute of limitations had expired as calculated by the State.

On appeal, the Hawai'i Supreme Court affirmed on the basis of the statute of limitations, but in doing so concluded that the Tax Appeal Court had erroneously limited its jurisdiction, even though a material element of each jurisdictional avenue was missing in the case. As is obvious from the circumstances of the case, a disputed assessment was lacking as required under chapter 238, governing appeals of use taxes, and a payment under protest was lacking under HRS § 40-35. Nevertheless, the court held that provisions of statute, though elemental, may not oust the jurisdiction of the Tax Appeal Court:

> Obviously, as Aloha Motors concedes, the prescribed procedures were not adhered to because no assessments or payments under protest occurred. By not observing the required steps, therefore, Aloha Motors is at fault, but the tax appeal court was not thereby divested of the jurisdiction to entertain an action contesting the Tax Director's decision. The governing statutes do not rob the tax appeal court of the power to hear aggrieved taxpayer petitions from adverse rulings by the Tax Director.

*Id.* at 520, 750 P.2d at 84 (citations omitted).

Indeed, in so holding, the court implied that explicit statutory language must affirmatively divest the Tax Appeal Court of jurisdiction in any particular case:

> This court must preserve the integrity of the tax provisions and give force to all parts of the applicable statutes. Because no statutory language supports the Tax Director's position on the tax appeal court's alleged lack of jurisdiction, we hold that the tax appeal court possessed the authority to review the merits of this use tax matter. Aloha Motors was thus entitled to a judicial hearing.

*Id.* at 520, 750 P.2d at 85 (citations omitted).

This court is in accord. In *Aetna Life Ins. Co. v. Park,* 5 Haw.App. 122, 678 P.2d 1104 (1984), foreign insurance companies filed suit in circuit court for refund of taxes paid in excess of those assessed domestic insurance companies. In affirming the circuit court's

dismissal for lack of subject matter jurisdiction, we held that specific statutory provisions expressly limited such an action to statutory appeal or suit under HRS § 40–35, thus affirmatively precluding original proceedings in the circuit court and placing them in the Tax Appeal Court. "Although section 661–1 appears to confer jurisdiction of this case on the circuit court, sections 231–23 and 40–35 specifically deny such jurisdiction." *Id.* at 126, 678 P.2d at 1107.

Arguably, the expansive judicial approach to tax dispute jurisdiction has yet to see its ultimate end. The Hawai'i Supreme Court in *In re Simpson Manor, Inc.*, 57 Haw. 1, 548 P.2d 246 (1976), implied "that circuit courts do have equity jurisdiction to hear excise tax disputes prior to payment of the disputed taxes where the taxpayer can show that prior payment 'would destroy its business, ruin it financially and inflict loss for which it would have no adequate remedy at law'." *Id.* at 3, 548 P.2d at 248 (quoting *Hawaii Meat Co. v. Kondo*, Civ. No. 24475, (1st Cir., decided Apr. 22, 1969)).[1] Thus the equitable approach to tax disputes might even outweigh, in the appropriate case, the government's ultimate interest in securing its financial position before being forced to address a tax dispute.

The tenacity of common law principles in this statutory area may be further illustrated by the apparent survival of the common law distinction, noted in passing, *supra*, between tax disputes challenging the amount of the tax or assessment, and tax disputes challenging the basic validity of the tax.

The Hawai'i Supreme Court seems to have revived that distinction in *In Re Smart*, 54 Haw. 250, 505 P.2d 1179 (1973). In that case, the taxpayer, aggrieved by a real property tax assessment, paid the bill under protest, then filed a HRS § 40–35 action. The taxpayer had apparently missed the statutory deadline for filing an appeal under chapter 246, the statutory scheme specific to real property tax assessments. The court held that the statutory scheme governed the taxpayer's appeal and thus reversed the Tax Appeal Court's denial of the Director of Taxation's jurisdictional motion to dismiss. In doing so, the court noted:

The [*Wilson v. Kunewa*, 29 Haw. 555 (1927) ] case, as Taxpayer suggests, stands for the proposition that a taxpayer may recover allegedly "illegal" real property taxes paid under protest by suing successfully under HRS § 40–35. However, where Taxpayer's suit contests the valuation placed upon the real property by the tax assessor rather than the legality of the assessment, we are of the opinion that the language of HRS § 246–46 applies exclusively.

*Id.* at 252, 505 P.2d at 1181. The case cited by the Hawai'i Supreme Court in its opinion, *Wilson v. Kunewa*, 29 Haw. 555, 1927 WL 3220 (1927), also involved a HRS § 40–35 dispute over real property taxes, but its controversy went to the basic validity of the assessment, not the amount thereof, and therein lay the whole difference.

## A.

On appeal in this case, the State asserts that the plain language of HRS § 40–35 bars an action thereunder unless there is a "dispute" between the taxpayer and the Department, quoting the following language: "Any *disputed portion of moneys representing a claim in favor of the State* may be paid under protest to a public accountant ... of the State *with which the claimant has the dispute.*" HRS § 40–35 (emphases added).

The underlying argument goes as follows.

HRS § 40–35(b) requires that "[a]ny action to recover payment of taxes under protest shall be commenced in the [T]ax [A]ppeal [C]ourt." The State points out that all tax appeals commenced in the Tax Appeal Court are governed by chapter 232, and that HRS § 231–23 limits taxpayer refund claims to the remedies exclusively provided by chapter 232 and HRS § 40–35. Thus the state asserts that chapter 232 and HRS § 40–35 must be read *in pari materia*, in order to achieve uniformity in the administration of the State's tax laws, and further quoting HRS § 1–16 (but note the second "shall" is, instead, "may" in the statute): "Laws in pari materia, or upon the same subject matter,

---

1. *Hawaii Meat Co.*, Findings of Fact and Conclusions of Law at 15.

shall be construed with reference to each other. What is clear in one statute [shall] be called in aid to explain what is doubtful in another."

Relying upon the definition of "dispute" in HRS § 232–13, the State argues that "dispute" for purposes of HRS § 40–35 is the difference between the taxpayer's computation of taxes due and the amount assessed by the Department. Since it is admitted in this case that there has been no assessment by the Department, the State concludes there is no "dispute" upon which Grace can base subject matter jurisdiction.

In the same vein, the State concedes that a "dispute" could have arisen had the Department denied Grace's refund request. There being no such denial, the State further argues lack of jurisdiction.

Finally, the State argues that HRS § 232–2 (Supp.1998), which states that "[n]o taxpayer shall be deemed aggrieved by an assessment to the extent that it is in accordance with the taxpayer's return," precludes relief because, by definition in this case of payment under protest, the payment was in accordance with Grace's own calculation of the disputed taxes.

The State's arguments might have some meretricious appeal if HRS § 40–35 and chapter 232 were, indeed, *in pari materia*, or statutes on the same subject matter. *In re Smart*, teaches us otherwise. Where, as here, the dispute is not over the amount of taxes, but over their basic validity, HRS § 40–35 is the avenue for taxpayer relief. Where the dispute is over the amount of the value or tax assessed, chapter 232, and chapters following concerning specific types of State taxes, apply. *In re Smart*, 54 Haw. at 252, 505 P.2d at 1181. Clearly, under the circumstances of this case, the respective statutes are Procrustean beds for each other, and the State's analysis cannot lie.

The proper analysis proceeds first from the plain language of the statute. " 'It is a cardinal rule of statutory interpretation that, where the terms of a statute are plain, unambiguous and explicit, we are not at liberty to look beyond that language for a different meaning. Instead, our sole duty is to give

effect to the statute's plain and obvious meaning.' " *Alvarez v. Liberty House, Inc.*, 85 Hawai'i 275, 278, 942 P.2d 539, 542 (1997) (quoting *Ross v. Stouffer Hotel Co. (Hawai'i) Ltd.*, 76 Hawai'i 454, 461, 879 P.2d 1037, 1044–45 (1994)) (citations omitted).

■ The State's primary argument imports into the statute a condition precedent of official exaction; that without Department assessment of taxes due from Grace, or denial of its refund request, the Tax Appeal Court lacks subject matter jurisdiction. As is obvious from its order and Judgment, the Tax Appeal Court accepted this argument.

The plain language of HRS § 40–35 contains, however, no mention of a formal assessment or denial of refund.

In its arguments to the Tax Appeal Court, the State made much of the dictionary definition of the word "claim" in positing a prerequisite of affirmative action by the State against the taxpayer. As set forth by the State, "claim" means "[t]o demand as one's own or as one's right; to assert; to urge; to insist. A cause of action. Means by or through which claimant obtains possession or enjoyment of privilege or thing. Demand for money or property as of right[.]" *Black's Law Dictionary* at 247.

If this is the interpretation of "claim" urged by the State, one might wonder why, if there is no "claim" absent affirmative State action, a multitude of citizens each April 20th file and pay State income taxes, with no small measure of trepidation at the prospect of default. And we question, further, whether the State would countenance its own interpretation when fixing the accrual date for penalty and interest on taxes not paid when due. *See* HRS § 231–39.

In any event, the State's dictionary argument founders near capsize when it is revealed that the definition quoted conveniently elides further defining material, such as, "[r]ight to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured[.]" *Black's Law Dictionary* at 247.

Not addressed by either party to this appeal is the odd circumstance of the language of HRS § 40–35, "[a]ny disputed portion of moneys representing a claim in favor of the State[.]" Surely "any disputed claim in favor of the State" would have been sufficient.

■ It is a cardinal rule of statutory construction that courts are bound, if rational and practicable, to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all the words of the statute. *Camara v. Agsalud,* 67 Haw. 212, 215–16, 685 P.2d 794, 797 (1984).

"Represent" means, in the lexicon, "[t]o appear in the character of; personate; to exhibit; to expose before the eyes. To represent a thing is to produce it publicly...." *Black's Law Dictionary* at 1301.

If "representing" is not mere surplusage in HRS § 40–35, it is, perhaps, exactly what Grace did in this case by forcing the State to squarely confront the issue.

■ As for the statutory proviso of a "dispute," this case seems to fit the dictionary definition:

A conflict or controversy; a conflict of claims or rights; an assertion of a right, claim, or demand on one side, met by contrary claims or allegations on the other. The subject of litigation; the matter for which a suit is brought and upon which issue is joined, and in relation to which jurors are called and witnesses examined.

*Black's Law Dictionary* at 472.

The Department's public informational releases, its directive to Grace, its audit of Grace, and the Director's thinly veiled public comments about Grace, all in relation to the subject tax issue, when coupled with Grace's payment under protest of the taxes at issue, surely created a "dispute" within the dictionary definition. And the Tax Appeal Court apparently found a true dispute in the case:

I guess technically speaking, looking at this from a common sense point of view, you obviously have your answer as to what the State is going to do in this case and I think we have an implicit adverse decision if you want to look at it in that sense[.]

The plain language approach affords little support for the Tax Appeal Court's conclusion that it lacks subject matter jurisdiction over Grace's request for refund.

■ Under precedent, what the statute contains is perhaps less important than what it lacks. As previously noted, appellate authority in Hawai'i counsels us not to oust jurisdiction in the Tax Appeal Court unless explicit statutory language affirmatively precludes it. *Aloha Motors,* 69 Haw. at 520, 750 P.2d at 85. Effectively a presumption of jurisdiction, this mandate clearly tilts the plain language approach against the State.

Going further in statutory interpretation, "we must read the language of a statute in the context of the entire statute and in a manner consistent with its purpose.... It is also well-accepted that a remedial statute is to be 'construed liberally in order to accomplish the purpose for which it was enacted.'" *Alvarez,* 85 Hawai'i at 278, 942 P.2d at 542 (citations omitted) (quoting *Flores v. United Air Lines, Inc.,* 70 Haw. 1, 12, 757 P.2d 641, 647 (1988)).

We have discussed the common law origins of HRS § 40–35 in equity, its generally remedial purpose, and the trend in judicial interpretation toward allowance of actions thereunder. All of these factors reinforce our conclusion that the Tax Appeal Court had subject matter jurisdiction to consider tax relief under HRS § 40–35, in this particular case.

We have also noted the willingness of the courts, in deciding tax disputes, to remain sensitive to business exigencies.

Fiscal uncertainty is anathema to any business. Without the immediate avenue of relief taken by Grace, the State could, as it argues on appeal, delay formal assessment or denial of refund until January of 2001 and thereby, during that period, deny Grace any resolution of a tax dispute involving over a million dollars a year.

It is difficult to imagine how a retail business could, under such fiscal uncertainty, deal effectively with the myriad decisions,

critical to survival, in financial planning, pricing policy, vendor and lender relationships, and the like. And it is simply disingenuous, under the circumstances, for the State to argue, as it does, that it has not already made the firm decision to deny the tax exemption claimed by Grace.

In balancing the prolonged business uncertainty faced by Grace against the State's purely strategic interest in a coy litigation stance, we should, in exercising due regard for the exigencies of commercial activity, come down on the side of prompt resolution. In doing so, we merely echo the conviction voiced by Justice Holmes early this century, that "justice may require that [the business taxpayer] should be at liberty to avoid those disadvantages by paying promptly and bringing suit on his side. He is entitled to assert his supposed right on reasonably equal terms." *Atchison* 223 U.S. at 286, 32 S.Ct. 216.

### B.

■ Grace's prayer for declaratory relief is two-fold, for judgment declaring (1) that Grace is a BDC within the meaning of chapter 420, and is, therefore, exempt from the Hawai'i GET and TAT pursuant to HRS § 420–16, and (2) that TIR No. 97–5 is invalid and unenforceable because it was promulgated in violation of HRS § 91–7.

In the face of the State's opposition, which cites HRS § 632–1, "declaratory relief may not be obtained . . . in any controversy with respect to taxes, . . . ." Grace asserts, without blushing, that it is not seeking judicial determination in a controversy specifically regarding taxes. Grace maintains, instead, that it seeks only to confirm that it is a valid business development corporation within the meaning of HRS chapter 420. Any impact of such a declaration upon the imposition of taxes would be, Grace insists, purely collateral.

This is pure sophistry. The controversy is pellucidly and undeniably with respect to taxes. If it were otherwise, Grace would have no reason to be in court. We note, in passing, that resolution of Grace's refund request on remand will, in any event, require the Tax Appeal Court to answer the very question Grace poses in its first prayer for declaratory relief.

Grace has not argued, on appeal, in support of its prayer for declaratory relief regarding TIR No. 97–5, but the same reasoning would control.

The Judgment and order of the Tax Appeal Court must, therefore, be affirmed with respect to all declaratory relief requested by Grace.

### V. CONCLUSION

Accordingly, the Judgment of the Tax Appeal Court is reversed as to Grace's refund request, but affirmed as to Grace's requests for declaratory judgment and for injunctive relief. The Tax Appeal Court's Order Granting Director of Taxation's Motion to Dismiss and Denying Plaintiff Grace Business Development Corporation's Motion for Summary Judgment is similarly vacated, in part, and affirmed, in part. The action is remanded to the Tax Appeal Court for further proceedings, consistent with this opinion, but only with respect to Grace's refund request under HRS § 40–35.

Dissenting Opinion of ACOBA, Associate J.

The scope of the tax appeal court's jurisdiction has been defined, over time, as encompassing three areas. First, Hawai'i Revised Statutes (HRS) § 232–11 (1993) describes the jurisdiction of the tax appeal court as one to "hear and determine appeals as provided in [HRS] section 232–16 or 232–17." [1] The references in HRS §§ 232–13 (1993), –16 (1993), and –17 (1993) to the "assessor" or the "assess-

---

1. Hawai'i Revised Statutes (HRS) § 232–16 (1993) states in pertinent part: "A taxpayer or county, in all cases, may appeal directly to the tax appeal court without appealing to a state board of review, or any equivalent administrative body established by county ordinance[.]"

HRS § 232–17 (1993) states in pertinent part: "An appeal shall lie to the tax appeal court from the decision of a state board of review, or equivalent administrative body established by county ordinance[.]"

ment"[2] seemingly limit the tax appeal court's jurisdiction to appeals in which assessments have been made. *See In re Smart*, 54 Haw. 250, 253, 505 P.2d 1179, 1181 (1973) (holding that appeals from real property tax valuations must be brought under HRS § 246–46 and not HRS § 40–35). Second, as a result of the apparently restrictive language in HRS §§ 232–13, –16, and –17, jurisdiction over a challenge to the "illegality" of a tax was said to be permitted under the protest payment provisions of HRS § 40–35 (1993). *Id.* at 252, 505 P.2d at 1181. Finally, where there was neither an assessment nor a protest payment, the Hawai'i Supreme Court has found, because of the absence of statutory language to the contrary, tax appeal court jurisdiction to hear "aggrieved taxpayer petitions from adverse rulings by the [t]ax [d]irector." *In re Tax Appeal of Aloha Motors*, 69 Haw. 515, 520, 750 P.2d 81, 84 (1988).

Thus, as a general matter, subject matter jurisdiction rests in the tax appeal court to hear taxpayer "appeals" from assessments, *In re Smart*, 54 Haw. at 253, 505 P.2d at 1181; challenges to taxes paid under protest, *Id.* at 252, 505 P.2d at 1181, HRS § 40–35; and adverse rulings by the [t]ax [d]irector, *In re Tax Appeal of Aloha Motors*, 69 Haw. at 520, 750 P.2d at 84. There being neither an outstanding assessment nor an adverse ruling by Defendant–Appellee Ray K. Kamikawa, Director of Taxation, State of Hawai'i (the Tax Director) in the instant case, the question is whether the protest payment by Plaintiff–Appellant Grace Business Development Corporation (Grace) satisfies the requirements of HRS § 40–35 so as to invoke subject matter jurisdiction of the tax appeal court. I am of the opinion that it does not,

and therefore would hold that jurisdiction does not lie in the tax appeal court. I consider the legislative history of HRS § 40–35 as supportive of this conclusion.

### I.

As originally enacted, the text of HRS § 40–35 stated in relevant part:

> Section 1521A. Moneys representing a claim in favor of the Territory of Hawaii may be paid to a public accountant of the Territory under protest in writing signed by the person making such payment, or by his agent, setting forth the grounds of such protest, in which event the public accountant to whom such payment is made shall hold the money so paid for a period of thirty days from the date of payment.

1907 Haw. Sess. L. Act 45, § 1, at 52. At the time this measure was adopted, a protest payment was seen as a means to resolve "differences of opinion aris[ing] between the Treasurer of the Territory and Citizens in regard to the amount which may be due the Government[.]" Sen. Stand. Com. Rep. No. 72, in 1907 Senate Journal, at 451–52.

However, in 1967, Revised Laws of Hawai'i (RLH) § 34–24 (1955) was amended, in part, to add the words "[a]ny disputed portion of" to the first sentence of the relevant text. According to the Senate committee report, the purpose of the amendment was to ensure that only funds relating "to the issues actually in dispute" may be paid under protest:

> Section 34–24, [RLH] 1955, as amended, authorizes the making of monetary payments under protest to the State of Hawaii. Monetary payments made under protest to the State of Hawaii are, after the filing of a suit by the payor, put into and held in a "litigated claims fund" and

2. HRS § 232–13 (1993), governing the procedure before the tax appeal court, states in pertinent part:

Irrespective of which party prevails in proceedings before a state board of review, or any equivalent administrative body established by county ordinance, *the assessment as made by the assessor*, or if increased by the board, or equivalent county administrative body, *the assessment as so increased*, shall be deemed prima facie correct.

(Emphases added.)

The relevant portion of HRS § 232–16 states that "[t]he taxpayer or county shall also file a copy of the notice of appeal in the *assessor's* office or mail a copy to the *assessor* not later than the date fixed by law for the taking of the appeal." (Emphases added.)

HRS § 232–17 states in pertinent part that "[a]n appeal shall lie to the tax appeal court … by the filing, by the taxpayer, the county, or *the tax assessor*, of a written notice of appeal in the office of the tax appeal court[.]" (Emphasis added.)

cannot be withdrawn from said fund until said suit is resolved. *The present wording of Section 34–24, however, enables persons involved in litigation with the State of Hawaii to make payments under protest to the State and include in such payments monies owing to the State of Hawaii but which do not relate to the issues actually in dispute. As such, the governmental agency or department involved in a payment under protest may be handicapped by having funds due and owing to it paid under protest and not available for use even if said funds do not relate to the issues actually in dispute in the suit filed against the State of Hawaii.*

S.B. No. 949 amends Section 34–24, [RLH] 1955, as amended, *so that only monies actually involving issues in dis-* *pute may be paid under protest to the State of Hawaii.*

Sen. Stand. Com. Rep. No. 542, in 1967 Senate Journal, at 1096 (emphases added).

The House committee report reiterated the statements of the Senate report. *See* Hse. Stand. Com. Rep. No. 857, in 1967 House Journal, at 813.

The legislature thus expressed concern that funds paid under protest "handicapped" the government because such monies were "not available for use." [3] Accordingly, the amendment was intended to ensure that monies paid under protest but not "related to the issues actually in dispute" were to be paid "into the appropriate fund." RLH § 34–24.[4] As employed in the legislative re-

---

3. In discussing the importance of the taxation power, the Territorial Supreme Court of Hawai'i stated:
   The power to authorize the assessment and collection of taxes is not only a rightful subject of legislation, but *it is an indispensable power incident to all forms of civilized government.* Taxes are defined as being the enforced proportional contribution of persons and property, levied by the authority of the state for support of the government, and for all public needs. The power of taxation is an incident of sovereignty, and is coextensive with that of which it is incident.
   *Keola v. Parker,* 21 Haw. 597, 600 (1913) (emphasis added; internal quotation marks and citations omitted). In finding that the statute of limitations did not bar a citizen's obligation to pay taxes, the čourt explained, "[T]he assessment and collection of taxes are of vital importance to the people of these islands.... The obligation of the citizen to pay his [or her] taxes is regarded as a continuing public duty which is so discharged only by their payment." *Id.* (internal quotation marks and citations omitted).

4. The 1967 amendment to Revised Laws of Hawaii § 34–24 (1955), which provided that only disputed portions of the claim in favor of the State of Hawai'i (the State) could be paid under protest, also vested in the director of finance the power to make the determination of the amount of the payment actually in dispute. The amended statute stated in pertinent part:
   *Any disputed portion of* moneys representing a claim in favor of the State may be paid to a public accountant of the State under protest in writing signed by the person making the payment, or by his agent, setting forth the grounds of protest, in which event the public accountant to whom payment is made shall hold the money paid under protest for a period of thirty days from the date of payment. *The director of* finance shall, at the request of the public accountant, make an administrative determination of the amount of the payment which is actually in dispute and the amount which is not in dispute. Upon such determination the public accountant shall deposit amounts not deemed in dispute by the director of finance in the appropriate fund.
   Haw. Sess. L. Act 251, § 1, at 374 (emphases added).
   In 1981, HRS § 40–35 was amended, authorizing the specific state agency with which a claimant has a dispute to receive the payment under protest and removing the director of finance's power to determine the amount in dispute. The amended version stated in pertinent part:
   Any disputed portion of moneys representing a claim in favor of the State may be paid under protest to *a public accountant of the department, board, bureau, commission, or other agency of the State with which the claimant has the dispute.* The protest shall be in writing, signed by the person making the payment, or by his agent, and shall set forth the grounds of the protest. If any payment, or any portion of any payment, is made under protest, *the public accountant to whom the payment is made shall hold that portion of the moneys paid under protest in a trust account* in the state treasury for a period of thirty days from the date of payment.
   1981 Haw. Sess. L. Act 251, § 1, at 374 (emphases added). By removing the reference to the director of finance and stating that "the public accountant to whom the payment is made shall hold the portion of moneys paid under protest," the legislature apparently implied that the accountant would have the authority to determine what portion of the protested payment was actually in dispute. *Id. See* Hse. Stand. Com. Rep. No. 53, in 1981 House Journal, at 967–68. The current version of HRS § 40–35 is substantively the same, with only technical amendments.

ports of the 1967 amendment, the word "actually" is the adverb form of the word "actual"; and actual means "existing in act or fact; real ... existing at present; current, real as of now." *Random House College Dictionary* 13 (1984). Thus, construed with regard to the legislature's intent, I believe the words "any disputed portion of" must refer to monies as to which an actual dispute exists.

## II.

It may be inferred from this legislative history that following the amendment, the gravamen of a protest payment is not merely a "difference[ ] of opinion" between the taxpayer and the government, as was said when the statute was first enacted, but some actual dispute which justifies payments to be segregated, and thus removed from governmental use pending judicial resolution of the controversy. In my view, there is no actual dispute within the meaning of HRS § 40–35 as to the monies paid by Grace, for the reasons which follow.

The majority's reversal of the court's order granting summary judgment is based on "[t]he Department[ ] [of Taxation's] public informational releases, its directive to Grace, its audit of Grace, and the Director's thinly veiled public comments about Grace, all in relation to the subject tax issues, ... coupled with Grace's payment under protest of the taxes at issue[.]" Majority opinion at 602. As I see the majority's rationale, jurisdiction over Grace's protest payment must rest on whether the other indicia listed amount to an actual dispute. While it may be believed that in all probability the Tax Director will assess the subject taxes against Grace in the future, he has not yet done so. Since the Tax Director has not in fact done so, we cannot say with certainty that he will. Until he does, I believe the dispute is "not real as of now" as is contemplated by HRS § 40–35. In the absence of such a dispute, there would be no tax appeal court jurisdiction.

As indicated above, the public policy implicit in the 1967 amendment precludes the payment of monies under protest unless such monies are the subject of an actual dispute. The text of HRS § 40–35 was amended to ensure that only those monies which are the subject of a real, present dispute may be paid under protest and therefore cognizable in the tax appeal court. This construction of HRS § 40–35 is consistent with and confirmatory of the prohibition in HRS § 632–1 (1993) against judicial jurisdiction over declaratory relief claims "in any controversy with respect to taxes."

Even the majority's definition of "dispute" taken from *Black's Law Dictionary* is consistent with the foregoing interpretation of HRS § 40–35. Applying that definition to the facts before us, there is, here, no demand on one side, no subject of litigation (unless it is circularly argued that Grace's suit is such litigation), and no "issue joined" ready for suit. The issue would be joined only *if* and *when* there is a determination of tax liability on Grace's part by the Tax Director. The effect of reversing the tax appeal court is to grant Grace what HRS § 632–1 prohibits. Under the majority's holding, on remand, Grace will obtain the declaratory ruling it seeks in the absence of an actual, existing, and current dispute required by HRS § 40–35.

## III.

I am not unsympathetic to the need of a business organization to plan its future. I cannot, however, agree that we should indulge in "imagin[ing]" what would befall Grace if jurisdiction were denied. Such speculation is unwarranted without facts in the record to verify the majority's concerns.

Neither do I join in the majority's description of the Tax Director's legal position as representing a "purely strategic interest in a coy litigation stance." I see nothing in the record to justify this belief and can conceive of no advantage to be gained by the State of Hawai'i in allegedly adopting such a "stance."

Lastly, I cannot attribute, from the record, any purposeful effort by the Director to delay assessment or a "denial of refund" to Grace, as the majority does. The tax department is authorized to conduct an audit as it is presently doing, to determine a taxpayer's liability for general excise taxes, HRS § 237–39 (1993), and for transient accommodation taxes, HRS § 237D–16 (1993). By statute,

the Tax Director is allowed three years from the date the annual return was filed to assess such taxes. HRS § 237–40 (1993). Consequently, any dissatisfaction with the period allowed the Tax Director to complete the audit must be addressed to the legislature.

### IV.

For the foregoing reasons, I would affirm summary judgment in favor of the Tax Director.