994 P.2d 540

In the Matter of the Tax Appeal of GRACE BUSINESS DEVELOPMENT CORPORATION, Respondent–Plaintiff–Appellant,

v.

Ray K. KAMIKAWA, Director of Taxation, State of Hawai'i, Petitioner–Defendant–Appellee.

No. 22028.

Supreme Court of Hawai'i.

Feb. 29, 2000.

Christopher J. Muzzi, Deputy Attorney General, on the writ, for petitioner-defendant-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, and RAMIL, JJ., and Circuit Judge SIMMS, assigned by reason of vacancy.

Opinion of the Court by MOON, C.J.

We granted the application of the petitioner-appellee Ray K. Kamikawa, Director of Taxation, State of Hawai'i [hereinafter, the Director] for a writ of certiorari on December 9, 1999 to review the decision of the Intermediate Court of Appeals (ICA). *See Grace Business Dev. Corp. v. Kamikawa,* 92 Hawai'i 659, 994 P.2d 591, 1999 WL 993904 (Haw.Ct.App.1999) [hereinafter, the ICA's majority opinion or the majority]. The majority reversed the tax appeal court's dismissal of respondent-appellant Grace Business Development Corporation's (Grace)

claim against the Director for lack of subject matter jurisdiction. The question presented is whether the ICA erred in holding that the tax appeal court had subject matter jurisdiction to consider a request for refund of taxes paid under protest, pursuant to Hawai'i Revised Statutes (HRS) § 40–35 (1993),[1] in the absence of a tax assessment, denial of a refund, or other adverse ruling. In accord with Associate Judge Acoba's dissenting opinion [hereinafter, the dissent], we hold that there was no actual dispute within the meaning of HRS § 40–35. Accordingly, we reverse the decision of the ICA with respect to HRS § 40–35 and affirm the tax appeal court's dismissal of the claim.

## I. BACKGROUND

The background facts are set forth in detail in the ICA's majority opinion. *Grace Business Dev. Corp.,* at 660–663, 994 P.2d at 592–595. Briefly stated, the facts are as follows:

Grace is one of a small number of businesses incorporated under HRS chapter 420 (1993) and claiming tax exemptions as a business development corporation (BDC). After incorporating as a BDC on December 11, 1996, Grace took over operation of the Nimitz Holiday Inn and the Best Western Plaza Hotel under a licencing agreement with the owner and previous operator, Nimitz Partners, on April 24, 1997.

HRS chapter 420, originally promulgated in 1957, authorized the creation of BDCs "for the purpose of promoting, developing, and advancing the prosperity and economic wel-

---

1. HRS § 40–35 provides, in relevant part:
 **Payment to State under protest.** (a) Any disputed portion of moneys representing a claim in favor of the State may be paid under protest to a public accountant of the department, board, bureau, commission, or other agency of the State with which the claimant has the dispute. The protest shall be in writing, signed by the person making the payment, or by the person's agent, and shall set forth the grounds of protest. If any payment, or any portion of any payment, is made under protest, the public accountant to whom the payment is made shall hold that portion of the moneys paid under protest in a trust account in the state treasury for a period of thirty days from the date of payment.

 (b) Action to recover moneys paid under protest or proceedings to adjust the claim may be commenced by the payer or claimant against the public accountant to whom the payment was made, in a court of competent jurisdiction, within thirty days from the date of payment. If no suit or proceeding is brought within the thirty-day period, the money paid under protest shall be deposited into the appropriate account in the treasury of the State by the accountant and the amount deposited shall thereupon become a government realization. Any action to recover payment of taxes under protest shall be commenced in the tax appeal court.

fare of the Pacific Islands[.]" HRS § 420–2(a) (Supp.1998). In addition to those powers enjoyed by business corporations under the general corporation laws, BDCs were granted powers generally associated with privately financed credit corporations, including, *inter alia,* the power to borrow and lend money, the power to hypothecate, and the power to assume and guarantee obligations. Chapter 420 exempted BDCs from certain state taxes, including the general excise/use tax (GET) and the transient accommodations tax (TAT). HRS § 420–16 (1993).

On October 17, 1997, the Director publicly issued Tax Information Release (TIR) No. 97–5, which reflected a change in the Department's policy with respect to BDC tax exemptions aimed at disallowing exemptions for businesses not intended to benefit from Chapter 420. Exemptions were previously afforded solely by virtue of incorporation under chapter 420; however, the TIR stated, in part, that:

> [HRS chapter 420] was enacted to permit the establishment of privately financed credit corporations which would make available medium and long-term capital in the form of loans and investments. The BDCs were given powers to accomplish the purpose of making capital available to small and medium size business entities.
>
> . . . .
>
> Substantial tax benefits are offered to BDCs because of the significant business risk they undertake in providing loans to struggling businesses for financing industrial businesses ... which will provide many jobs.
>
> BDCs may not be formed for the purpose of conducting active business enterprises, such as movie theaters, management consulting services, or retailing. The Department will challenge any tax benefits claimed for BDCs formed or operated for these and any other purposes not within the design and intent of the law.

On December 10, 1997, a taxation compliance administrator with the Department sent Grace a letter noting its status as a BDC, advising it of the issuance of TIR No. 97–5, and enclosing a copy thereof. All registered BDCs were sent similar notices. By letter dated December 19, 1997, the Department notified Grace it was commencing an audit of its operations with respect to all taxes administered by the Department.

On January 20, 1998, Grace filed a GET return and a TAT return, both for the month of April 1997, and paid the applicable taxes under protest pursuant to HRS § 40–35, stating:

> It is Grace's position that because it is a valid [BDC] lawfully formed pursuant to HRS chapter 420, it is not subject to Hawaii general excise taxes or transient accommodations taxes. It is also Grace's position that as a[BDC] it is not obligated to report its gross income on, or file [sic] general excise tax returns or transient accommodations tax returns.

On January 23, 1998, Grace filed, in the tax appeal court, its Complaint for Refund of Taxes and Declaratory Judgment and Injunctive Relief against the Director.

Thereafter, the 1998 Legislature passed Act 157, § 5, repealing HRS chapter 420, effective December 31, 2001, and gradually eliminating its tax exemption on a four-year sliding scale in the interim. 1998 Haw. Sess. L. Act 157, § 5 at 596–97.

On May 21, 1998, the Director issued TIR No. 98–3, which reiterated that the Department "will not consider operating business activities as fulfilling the purposes and requirements of chapter 420, HRS, and ... to challenge any tax exemptions or credits taken with respect to those activities."

On May 26, 1998, the *Honolulu Advertiser* headlined its "Business" section with an article about BDCs and their impending demise. The article featured several quotations of the Director, including the following:

> [W]e haven't found one BDC that fulfills the purposes of the BDC law, ... so we're going to disallow their exemptions immediately, without any regard to the phase-out schedule.
>
> . . . .
>
> "Company C," which is in the hotel industry, has avoided paying $520,000 in [GETs] and $690,000 in [TATs].

Although the Director declined to name specific BDCs, the article identified Grace as a BDC that operates the Plaza Hotel. The deposition testimony of a Department employee confirmed that Grace was "Company C."

On March 24, 1998, the Department, internally, had estimated annual tax losses due to Grace's HRS chapter 420 exemption to be $722,949 in GETs and $693,794 in TATs. A proposed assessment prepared by the Department for 1997 totaled $1,151,909.80. However, no notice of assessment was sent to Grace.

On July 17, 1998, Grace filed a motion for summary judgment for the declaratory relief and refund prayed for in its complaint. Simultaneously, the Director filed a motion to dismiss, alleging a failure to state a claim for which relief could be granted. Grace conceded that the tax appeal court lacked jurisdiction under HRS chapter 232 (1993) regarding tax appeals because there was no extant assessment, but claimed that the tax appeal court had jurisdiction under HRS § 40–35. Grace also acknowledged that its prayer for injunctive relief was moot.

On August 11, 1998, the tax appeal court heard Grace's motion for summary judgment and the Director's motion to dismiss. The tax appeal court's October 2, 1998 order stated the grounds for decision as follows:

> Director's Motion to Dismiss is granted on the ground that the Tax Appeal Court lacks jurisdiction over this case because (1) [Grace] has not met the disputed claim or assessment requirements for an appeal to this court under HRS § § 40–35, or 232–11, (2) HRS § 632–1 prohibits declaratory relief in any controversy with respect to taxes, and (3) [Grace] has advanced no grounds for injunctive relief. For the same reasons, [Grace]'s Motion for Summary Judgment is denied.

Judgment was entered on the same date.

On appeal to the ICA, Grace argued that the tax appeal court erred because (1) HRS § 40–35 does not require an assessment or demand for payment by the Director of a specific amount of taxes as a technical precondition to a claim by a taxpayer for refund of payment made under protest, and (2)

Grace's action for declaratory relief sought a determination that it was a valid [BDC] rather than a determination of a controversy with respect to taxes. The ICA reversed the judgment of the tax appeal court as to Grace's refund request, but affirmed the judgment as to Grace's request for declaratory relief.

As to Grace's refund request, the ICA's majority opinion held that the tax appeal court had subject matter jurisdiction over Grace's request for a refund of taxes paid under protest pursuant to HRS § 40–35 because a "dispute" existed between Grace and the Director. The majority's holding was based, in part, on its determination that "[t]he Department's public information releases [TIRs], its directive to Grace, its audit of Grace, and the Director's thinly veiled public comments about Grace, all in relation to the subject tax issue, when coupled with Grace's payment under protest of the taxes at issue, surely created a 'dispute[.]'" *Grace Business Dev. Corp.*, at 670, 994 P.2d at 602.

## II. STANDARDS OF REVIEW

 "Inasmuch as the facts [of this case] are undisputed and the sole question is one of law, we review the decision of the [t]ax [a]ppeal [c]ourt under the right/wrong standard." *Kamikawa v. Lynden Air Freight, Inc.*, 89 Hawai'i 51, 54, 968 P.2d 653, 656 (1998) (citations and internal quotation marks omitted). "The interpretation of a statute is a question of law reviewable *de novo.*" *Gray v. Administrative Director of the Court, State of Hawai'i*, 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (citations omitted); *see also Maile Sky Court Co., Ltd. v. City and County of Honolulu*, 85 Hawai'i 36, 39, 936 P.2d 672, 675 (1997) (citations omitted).

## III. DISCUSSION

██ The Director contends that the ICA erred in holding that the tax appeal court had subject matter jurisdiction pursuant to HRS § 40–35 because the Department has made no formal assessment of the taxes in question nor has it administratively denied Grace's refund request. The Director as-

serts that any decision regarding official exaction must await completion of its audit of Grace. Grace argues that HRS § 40–35 requires prompt resolution of "disputes" where the taxpayer pays taxes under protest pursuant to HRS § 40–35 and the taxpayer challenges the Department's policy regarding the validity of a tax exemption. Grace contends that any delay in resolution of this matter "mires" it in financial uncertainty.

■ As noted by the dissent,

[A]s a general matter, subject matter jurisdiction rests in the tax appeal court to hear taxpayer 'appeals' from assessments, *In re Smart*, 54 Haw. at 253, 505 P.2d at 1181,[2] [*see also* HRS chapter 232]; challenges to taxes paid under protest, *Id.* at 252, 505 P.2d at 1181, HRS § 40–35; and adverse rulings by the [Director], *In re Tax Appeal of Aloha Motors*, 69 Haw. 515, 520, 750 P.2d 81, 84 (1988). There being neither an outstanding assessment nor an adverse ruling by [the Director] in the instant case, the question is whether the protest payment by [Grace] satisfies the requirements of HRS § 40–35 so as to invoke subject matter jurisdiction of the tax appeal court.

*Grace Business Dev. Corp.*, at 672, 994 P.2d at 604. As previously noted, HRS § 40–35 provides in relevant part:

(a) Any *disputed portion of moneys representing a claim in favor of the State may be paid under protest* to a public accountant of the department, board, bureau, commission, or other agency of the State with which the claimant has the dispute....

(b) Action to recover moneys paid under protest or proceedings to adjust the claim may be commenced ... within thirty days from the date of payment.... *Any action to recover payment of taxes under protest*

*shall be commenced in the tax appeal court.*

*See supra* note 1 (emphasis added).

■ Adopting the dissent's analysis of both the statutory language and the legislative history of HRS § 40–35, we hold that there must be an "actual dispute" before a taxpayer can make a payment under protest and bring an action under this section. *See Grace Business Dev. Corp.*, at 672–673, 994 P.2d at 604–605 (citing, *inter alia*, Sen. Stand. Com. Rep. No. 542, in 1967 Senate Journal, at 1096 (reflecting legislative intent to ensure that "only monies actually involving issues in dispute may be paid under protest" and to prevent "persons involved in litigation with the State [from making] payments under protest to the State and include in such payments monies owing to the State of Hawaii but *which do not relate to the issues actually in dispute*" (emphasis added))).

■ The need to avoid premature adjudication supports a definition of "dispute" that requires more than a "difference of opinion" as to policy. The rationale underlying the ripeness doctrine and the traditional reluctance of courts to apply injunctive and declaratory remedies to administrative determinations is "to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (discussing the purpose of the requirement of final agency action in administrative appeals under the federal Administrative Procedure Act),[3] *overruled on other grounds, Califano*

**2.** The ICA's majority opinion cites *In re Smart*, 54 Haw. 250, 505 P.2d 1179 (1973), for the proposition that HRS § 40–35 is the appropriate remedy for taxpayers challenging the validity of a tax paid, versus the amount of tax paid. In *In re Smart*, this court held that HRS § 40–35 did not apply where a "[t]axpayer's suit contests the valuation ... [of a] real property ... [assessment]" rather than the legality of the assessment" because the real property tax code contained a statute specifically providing for appeals from

excessive valuations. We need not address whether the holding in *In re Smart* applies analogously to GET and TAT tax assessments in the instant petition because the issue before this court is whether there was an actual dispute under HRS § 40–35 *in the absence of an assessment.*

**3.** In its initial complaint and memorandum in support of its motion for summary judgment,

*v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

We agree with Grace that: (1) the TIRs signaled a change in policy by the Department regarding tax exemptions for BDCs; (2) the Department took a position as to the tax exempt status of BDCs conducting active business enterprises; (3) the Director is likely to challenge any GET or TAT exemption claimed by Grace; and (4) without a prompt resolution of the matter, Grace faces some degree of financial uncertainty. However, the uncertainty faced by Grace is common to any taxpayer seeking an advance binding determination of tax liability. In this case, it may be possible to predict what the Director *will do.* In fact, the TIRs provided the public and all BDCs with notice of the Department's policy and its interpretation of the law, thereby enabling Grace to better predict its own tax liability.[4] This notice, however, did not amount to a decision with respect to any specific taxpayer. The Director retains the power to change his position with respect to Grace after completing the audit and should not be bound by public statements or general information releases regarding departmental policies.

We decline to follow the reasoning of the ICA's majority opinion, which requires a case-by-case factual analysis of whether the surrounding circumstances are sufficient to constitute a "dispute" and/or "claim." In this case, the Director had not yet taken any action with respect to Grace prior to the filing of Grace's lawsuit. In our view, the majority's reliance on events that took place *after* the filing of Grace's action, such as statements to the newspaper or testimony regarding proposed assessments, is mis-

placed insofar as such events are not relevant to the determination whether a dispute existed *at the time* of the payment under protest. Thus, where an administrative decision has not been formalized, simply arguing that there is a "dispute" or "difference of opinion" with Department policy and paying taxes under protest does not present an actual dispute under HRS § 40–35.

The requirement of a formal administrative decision, such as a notice of assessment, denial of refund, or an adverse ruling, prior to filing suit under HRS § 40–35 is consistent with HRS § 632–1 (1993), which requires an "actual controversy" in order to confer jurisdiction and provides that "declaratory relief may not be obtained … in any controversy with respect to taxes[.]"[5] In contrast, permitting Grace to demand that the Director resolve the question whether Grace is entitled to the refund requested by paying under protest before an audit is completed or any formal decision is made, in effect, grants Grace declaratory relief in contravention of HRS § 632–1. The ICA's majority opinion seems to acknowledge that the conferral of jurisdiction under HRS § 40–35, in essence, granted Grace declaratory relief by "not[ing], in passing, that resolution of Grace's refund request on remand will … require the Tax appeal court to answer the very question Grace poses in its first prayer for declaratory relief." *Grace Business Dev. Corp.,* at 671, 994 P.2d at 603.

The Department, by statute, is given three years to complete an audit and assess taxes, or it is forever barred from making a claim. HRS § 237–40 (1993) (regarding GETs); HRS § 237D–9(c) (1993) (regarding TATs).

Grace challenged the policy of the Department and the issuance of the TIRs regarding BDCs under the Hawaii Administrative Procedure Act (HAPA), HRS Chapter 91 (1993); however, this issue was not raised on appeal.

4. Furthermore, "[i]t is well established that exemptions from taxation are strictly construed against the taxpayer." *In re Tax Appeal of Aloha Motors, Inc.,* 56 Haw. 321, 326, 536 P.2d 91, 94 (1975).

5. The prohibition against declaratory relief in controversies with respect to taxes was added to the language HRS § 632–1 in 1972, in accord with the federal Declaratory Judgment Act, 28

U.S.C. § 2201. HRS § 632–1, am L 1972, c 89, § 1(a); Committee on Coordination of Rules and Statutes, Report to Joint Interim Committee for Consideration of the Statutory Revision Program, v.1, § 632 (September 1, 1971). The federal Declaratory Judgment Act also prohibits declaratory relief in tax controversies in order to "permit the government to assess and collect taxes alleged to be due it without judicial interference." *See Ingham v. Hubbell,* 462 F.Supp. 59, 64 (1978) (holding that Declaratory Judgment Act barred taxpayer's action where no assessment extant and taxable event had not yet occurred).

The ICA's majority opinion uses the commencement of an audit as a factor in determining jurisdiction and, thus, requires the Department to make an immediate determination of liability, entangles the tax appeal court in the administrative processes of the Department, and essentially allows taxpayers undergoing an audit to bypass statutory provisions. We are not unsympathetic to business exigencies and the concerns raised by the ICA's majority opinion regarding the need for efficient resolution of tax matters. However, as previously stated, Grace's position is not unique; rather, it is a position faced by any taxpayer seeking advance determination of the outcome of an audit where the taxpayer has claimed an exemption. Accordingly, as noted by the dissent, "any dissatisfaction with the period allowed the Tax Director to complete the audit must be addressed to the legislature." *Grace Business Dev. Corp.*, at 675, 994 P.2d at 607.

### IV. *CONCLUSION*

Based on the foregoing, we hold that, in the absence of a formal administrative decision by the Director, Grace's payment under protest did not represent an actual dispute within the meaning of HRS § 40-35. Therefore, we reverse the decision of the ICA, in part, with respect to the conferral of jurisdiction under HRS § 40-35 and affirm the tax appeal court's dismissal of Grace's claim for lack of subject matter jurisdiction.