28 P.3d 350

Donald A. BREMNER, Plaintiff–
Appellant,

v.

The CITY & COUNTY OF HONOLULU,
a Hawaii Municipal Corporation,
Defendant–Appellee.

No. 22540.

Intermediate Court of Appeals of Hawai'i.

June 18, 2001.

Reconsideration Denied July 5, 2001.

Certiorari Denied Aug. 13, 2001.

Donald A. Bremner, plaintiff-appellant, on the briefs, pro se.

Jane H. Howell, and Duane W.H. Pang, Deputies Corporation Counsel, on the briefs, for defendant-appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by LIM, J.

Plaintiff–Appellant Donald A. Bremner (Bremner) filed a complaint against the City and County of Honolulu for the purpose of voiding two City ordinances relating to zoning and development in Waikiki. In dismissing Bremner's complaint, the first circuit court, the Honorable Gail C. Nakatani presiding, found that he suffered no cognizable injury sufficient to imbue him with standing to challenge the ordinances, and that adjudication of the validity of the ordinances was not ripe, pending their actual implementation.

On appeal, Bremner contends that the ordinances violate his free speech, due process and equal protection rights under the federal and State constitutions, as well as numerous provisions of State statutes, the City Charter and City ordinances. For the following reasons, we affirm the circuit court's judgment dismissing Bremner's complaint.

## I. Background.

The Honolulu City Council is the primary governing body responsible for formulating planning and development policies for the City and County of Honolulu. The Council utilizes three primary tools in furtherance of this responsibility.

The broadest and most holistic of these is the City's general plan, which "shall set forth the city's objectives and broad policies for the long range development of the city." Revised Charter of the City & County of Honolulu (RCH) § 5–407 (1994). As such, the general plan "shall contain statements of the general social, economic, environmental and design objectives to be achieved for the general welfare and prosperity of the people of the city and the most desirable population distribution and regional development pattern." *Id.*

Development plans are intended to provide more specific "conceptual schemes for implementing and accomplishing the development objectives and policies of the general plan within the city." RCH § 5–408 (1994). Development plans must articulate "statements of standards and principles with respect to land uses, statements of urban design principles and controls, and priorities as necessary to facilitate coordination of major development activities." *Id.* They must also be sufficiently descriptive to "serve as a policy guide for more detailed zoning maps and regulations and public and private sector investment decisions." *Id.*

Finally, zoning ordinances contain site-specific and thoroughly comprehensive guidelines for assessing the permissibility of proposed development on a given property. Zoning ordinances are thus designed to "carry out the purpose of the general plan and development plans" by enunciating "reasonable standards with respect to the location, bulk, size and permitted densities of buildings and other structures, the area of yards and other open spaces, off-street parking and loading spaces, and the use of buildings and lots." RCH § 6–907 (1994).

In addition to being specified in the RCH, the interrelationship between the general and development plans and their corresponding zoning ordinances is governed by Hawai'i Revised Statutes (HRS) § 46–4 (1993), which delegates zoning authority to the counties. That statute requires that "[z]oning in all counties shall be accomplished within the framework of a long range, comprehensive general plan . . . to guide the overall future development of the county." Accordingly, HRS § 46–4 contemplates that zoning "be one of the tools available to the county to put the general plan into effect in an orderly manner." Moreover, the statute directs that each county's zoning powers "shall be liberally construed in favor of the county exercising them, and in such a manner as to promote the orderly development of each county or city and county in accord with a long range, comprehensive, general plan, and to insure the greatest benefit for the State as a whole." *Id.*

On November 13, 1996, the Honolulu City Council passed, by an 8–1 vote, ordinance No. 96–70 (the development plan ordinance), a bill to amend the development plan of Waikiki for the purpose of strengthening the area's economic viability. In amending §§ 24–2.2 and 24–2.3 of the Revised Ordinances of Honolulu (ROH) (1990), the development plan ordinance revised development guidelines on such matters as building density, transportation, infrastructure, aesthetic and cultural preservation, recreational resources and residential communities.

On December 4, 1996, the Council passed, by a 6–3 vote, ordinance No. 96–72 (the zoning ordinance), a bill to revise the zoning guidelines for Waikiki. In amending the land use ordinance, ROH ch. 21 (1990), the zoning ordinance implemented the new development objectives contained in the development plan ordinance.

On May 12, 1997, Bremner filed a complaint in federal district court challenging the validity of the development plan ordinance and the zoning ordinance (collectively, the 1996 ordinances) on grounds that they violated his federal due process and equal protection rights under the United States Constitution, as well as his civil rights under 42 U.S.C. § 1983. On February 3, 1998, the district court dismissed that complaint, finding that Bremner "lacks standing and that his claims are not ripe for adjudication."

Following the dismissal of his complaint by the federal district court, Bremner filed this action on March 5, 1998, seeking a declaratory judgment voiding the 1996 ordinances. The City filed a motion to dismiss the complaint on February 7, 1999.

At a hearing on March 10, 1999, the circuit court dismissed the complaint. In its oral ruling, the court first noted that "the complaint cannot be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief and the allegations in the complaint are taken as admitted and are construed to be true."

Applying this standard, the court reasoned that Bremner "has no standing as he has suffered at this time no quantifiable injury in fact." The court found that Bremner's "deep personal interest do [sic] not give rise to such injury[,]" and that, as a result, he is "nothing more than a concerned citizen."

In addition to finding that Bremner lacked standing to challenge the 1996 ordinances, the court observed that "the issues with [sic] which [Bremner] attempts to raise by way of his complaint are not ripe for review in that the ordinances have not been implemented in anyway [sic]." The court noted that "there must be a specific development or a specific project which gives rise to a claim[,]" and therefore, "there can be at this time no legally recognized injury because of the speculative situation—because of the lack of the implementation." The court concluded that, "under these circumstances, the Court does not believe that there is any way that the plaintiff could prevail on any of his allegations in the complaint." The court then granted the City's motion to dismiss.

## II. Standard of Review.

Review of a motion to dismiss "is based on the contents of the complaint, the allegations of which we accept as true and construe in the light most favorable to the plaintiff. Dismissal is improper unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Norris v. Hawaiian Airlines, Inc.*, 74 Haw. 235, 240, 842 P.2d 634, 637 (1992) (citation and internal block quote format and internal quotation marks omitted). Because such a review is a matter of law,

> [w]e review the trial court's [conclusions of law] *de novo* under the right/wrong standard. *Raines v. State*, 79 Hawai'i 219, 222, 900 P.2d 1286, 1289 (1995). "Under this ... standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Miller*, 4 Haw.App. 603, 606, 671 P.2d 1037, 1040 (1983). *See also Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 119, 839 P.2d 10, 28, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992). Thus, a [conclusion of law] "is not binding upon the

appellate court and is freely reviewable for its correctness." *State v. Bowe,* 51, 53, [*sic*] 77 Hawai'i 51, [53,] 881 P.2d 538, 540 (1994) (citation omitted).

*Brown v. Thompson,* 91 Hawai'i 1, 8, 979 P.2d 586, 593 (1999) (citations and internal block quote format omitted, some brackets in the original).

## III. Discussion.

### A. *The Zoning Ordinance.*

In his complaint, Bremner contended that the zoning ordinance is unlawful because (1) it conflicts with the express provisions of the City's general plan, in violation of HRS § 46–4; (2) it is impermissibly vague and encourages arbitrary and discriminatory application, in violation of his due process and equal protection rights under the Fourteenth Amendment to the United States Constitution and article I, section 5 of the Hawai'i Constitution; and (3) it was enacted without the benefit of an environmental assessment, in violation of his right to a clean and healthy environment under article XI, section 9 of the Hawai'i Constitution.

For the reasons discussed below, we agree with the circuit court that Bremner lacks standing to pursue the first and second of these claims, and that, in any event, those issues are not yet ripe for consideration. We furthermore believe that Bremner's third claim is without support in the law and is, in any event, barred as untimely.

### 1. *The Issue of Standing.*

In considering the question of standing, we do not proceed boldly, but cautiously. Not only must we determine that the controversy is one capable of judicial resolution, but where, as here, the constitutional prerogative of another branch of government is involved, we must be especially chary of overstepping our proper role and capabilities:

> Though the courts of Hawaii are not subject to a "cases or controversies" limitation like that imposed upon the federal judiciary by Article III, § 2 of the United States Constitution, we nevertheless believe judicial power to resolve public disputes in a system of government where there is a separation of powers should be limited to those questions capable of judicial resolution and presented in an adversary context. For "prudential rules" of judicial self-governance founded in concern about the proper—and properly limited—role of courts in a democratic society are always of relevant concern. And even in the absence of constitutional restrictions, courts still carefully weigh the wisdom, efficacy, and timeliness of an exercise of their power before acting, especially where there may be an intrusion into areas committed to other branches of government. In short, judicial intervention in a dispute is normally contingent upon the presence of a "justiciable" controversy.
>
> Standing is that aspect of justiciability focusing on the party seeking a forum rather than on the issue he wants adjudicated.

*Life of the Land v. Land Use Comm'n,* 63 Haw. 166, 171–72, 623 P.2d 431, 438 (1981) (citations and some internal quotation marks omitted).

The crucial inquiry in any analysis of standing is "whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of the court's jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Id.* at 172, 623 P.2d at 438 (citation and internal quotation marks, brackets and ellipsis omitted; emphasis in the original). Whether a plaintiff has the requisite "personal stake" in the outcome of the litigation is measured by a three-part, "injury in fact" test. Under that test, the plaintiff must allege that "(1) he or she has suffered an actual or threatened injury as a result of the defendant's wrongful conduct, (2) the injury is fairly traceable to the defendant's actions, and (3) a favorable decision would likely provide relief for the plaintiff's injury." *Bush v. Watson,* 81 Hawai'i 474, 479, 918 P.2d 1130, 1135 (1996). *See also Mottl v. Miyahira,* 95 Hawai'i 381, 391, 23 P.3d 716, 726 (2001). The point of the first prong of the test is, that "the plaintiff must show a distinct and palpable injury to himself or herself. The injury must be distinct and palpable, as op-

posed to abstract, conjectural, or merely hypothetical." *Akinaka v. Disciplinary Board*, 91 Hawai'i 51, 55, 979 P.2d 1077, 1081 (1999) (brackets, citations and internal quotation marks omitted).

■ Due to a modern trend toward a more expansive interpretation of standing, a plaintiff's "personal stake" in the outcome of a controversy may arise from a defendant's infringement of personal or special interests that is separate and distinct from the traditional basis of infringement of legal rights or privileges. *Life of the Land*, 63 Haw. at 172–77, 623 P.2d at 438–41.

■ Such interests may, for instance, be implicated whenever adjacent property development threatens identifiable aesthetic or environmental harm. *See, e.g., Dalton v. City & County of Honolulu*, 51 Haw. 400, 402–03, 462 P.2d 199, 202 (1969) (landowners residing "in very close proximity" to re-zoned land thus demonstrated a "concrete interest" in safeguarding the "scenic view, . . . sense of space and . . . [existing] density of population" of their properties from adjacent high-density development; hence, they had standing to maintain their suit for a declaratory judgment voiding certain amendments to City general plan and land use ordinances (citation and internal quotation marks omitted)).

■ An alleged harm to specific recreational interests may also suffice to establish standing. *See, e.g., Life of the Land*, 63 Haw. at 176 n. 9, 623 P.2d at 440 n. 9 (plaintiffs' use of rezoned lands for "diving, swimming, hiking, camping, sightseeing, horseback riding, exploring and hunting and for aesthetic, conservational, occupational, professional and academic pursuits" created a cognizable interest in challenging the land use commission's boundary review which resulted in the rezoning; the plaintiffs were neither owners of reclassified land nor owners of land adjoining the reclassified land (internal block quote format omitted)); *Citizens v. County of Hawai'i*, 91 Hawai'i 94, 101, 979 P.2d 1120, 1127 (1999) (allowing a declaratory relief challenge to proposed shoreline development after plaintiffs, who resided "in close proximity" to the site, al-

leged use of the area for "picnics, swimming and boating[,]" fishing, and "gathering Hawaiian plants and herbs" (ellipsis and internal quotation marks omitted)).

■ Our case law also acknowledges that plaintiffs may demonstrate standing by alleging harm to their exercise of cultural and religious interests. *See, e.g., Pele Defense Fund v. Paty*, 73 Haw. 578, 589–90, 837 P.2d 1247, 1256 (1992) (held native Hawaiian organization had standing to contest transfer of public ceded lands following allegation that the land exchange would impede the group's "customarily and traditionally exercised subsistence, cultural and religious practices" on those lands).

■ Furthermore, we are mindful that standing requirements may be "tempered" or otherwise "prescribed" by legislative declarations of policy. *Life of the Land*, 63 Haw. at 172, 623 P.2d at 438. The *Life of the Land* court specifically identified "HRS Chapter 632, Declaratory Judgments, and Hawaii State Constitution, Article XI, Section 9, Environmental Rights[,]" as examples of such declarations. *Id.* at 172 n. 5, 623 P.2d at 438 n. 5 (citations omitted). This specific reference is pertinent to this case because Bremner sought his declaratory judgment under HRS ch. 632. He also alleges in his complaint an injury to his environmental rights under the Hawai'i Constitution.

Chapter 632 delineates the types of cases amenable to judicial resolution by means of a declaratory judgment. Specifically, HRS § 632–1 (1993) provides that

[r]elief by declaratory judgment may be granted in civil cases where an actual controversy exists between contending parties, or where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein, and the court is satisfied also that

a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.

Chapter 632's overarching purpose is thus "to afford relief from the uncertainty and insecurity attendant upon controversies over legal rights, without requiring one of the parties interested so to invade the rights asserted by the other as to entitle the party to maintain an ordinary action therefor." HRS § 632–6 (1993). The chapter also instructs that its provisions are to be "liberally interpreted and administered, with a view to making the courts more serviceable to the people." *Id.* Such language, when read comprehensively, "interposes less stringent requirements for access and participation in the court process" than traditional standing requisites might otherwise dictate. *Citizens,* 91 Hawai'i at 100, 979 P.2d at 1126.

Finally, our standing analysis is prefaced on the belief that "[o]ur touchstone remains the needs of justice." *Life of the Land,* 63 Haw. at 176, 623 P.2d at 441 (citation and internal quotation marks omitted). Thus, "while every challenge to governmental action has not been sanctioned, our basic position has been that standing requirements should not be barriers to justice." *Id.* at 173–74, 623 P.2d at 439 (footnote omitted). We are mindful that "[o]ne whose legitimate interest is in fact injured by illegal action of an agency or officer should have standing because justice requires that such a party should have a chance to show that the action that hurts his interest is illegal." *Id.* at 174 n. 8, 623 P.2d at 439 n. 8 (citations and internal quotation marks and block quote format omitted). These general principles apply *a fortiori* where the one who is injured in fact also represents rights of the public:

> This court has adopted a broad view of what constitutes a "personal stake" in cases in which the rights of the public might otherwise be denied hearing in a judicial forum. [*Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276,] 283,

768 P.2d [1293,] 1299 [(1989)]; *see also Akau[ v. Olohana Corp.*], 65 Haw. [383,] 387–88, 652 P.2d [1130,] 1134 [(1982)].

In *Akau,* we held "that a member of the public has standing to sue to enforce the rights of the public generally, if he can show that he has suffered an injury in fact, and that the concerns of a multiplicity of suits are satisfied by any means, including a class action." 65 Haw. at 388–89, 652 P.2d at 1134 (cited in *Hawaii's Thousand Friends,* 70 Haw. at 283, 768 P.2d at 1299). *Pele Defense Fund,* 73 Haw. at 593, 837 P.2d at 1257–58. *See also Citizens,* 91 Hawai'i at 101, 979 P.2d at 1127.

Guided by these considerations, we turn to Bremner's complaint.

In essence, the "personal stake" Bremner pled in the present controversy arises from his extensive participation in drafting the development and zoning regulations for Waikiki that he alleges were derogated by amendments effected by the zoning ordinance. As chairman of the City's Planning Advisory Committee on Waikiki during the 1970s, Bremner was popularly credited as the "father" of Waikiki's original special district regulations. His personal commitment to the area's preservation is further evident from his seventeen years of service as executive vice president of the Waikiki Improvement Association and from his membership on the City's Advisory Committee for Waikiki. Moreover, as a trained city planner, Bremner maintains a professional interest in Waikiki's development. Given the nature and degree of his expertise, employment and community involvement, Bremner doubtless harbors a genuine and longstanding desire to protect Waikiki's aesthetic, environmental, recreational and cultural resources.[1]

Bremner's complaint and opening brief recite a litany of general public ills that he speculates will result from the changes wrought by the zoning ordinance. Bremner hypothesizes that high density development will create "overcrowding" and place a corre-

---

1. Plaintiff–Appellant Donald A. Bremner (Bremner) also indicates, in his opening brief, that he previously served as a member and chairman of the State Environmental Commission, advised the City Department of Land Utilization on planning regulations for Waikiki, and was a director for the Kapiolani Park Preservation Society and the public interest organization, Protect Ala Wai Skyline. Opening Brief 7–9. Bremner omitted these facts from his complaint.

sponding strain on the environment. Moreover, "new water sources and a major upgrade of the sewage system" will be needed to accommodate "any additional development in Waikiki"; at a cost, Bremner estimates, of one hundred million dollars. He further alleges that "overcrowding Waikiki will also overcrowd Waikiki Beach[,] adversely impacting its conservation as a natural resource and diminishing its recreational value to the people." Bremner concludes that "[s]uch overcrowding would eventually impact our economy by rendering Waikiki unattractive to the world market of tourism."[2]

Other than the foregoing allegations, Bremner did not cite in his complaint any "personal stake" in this controversy beyond general constitutional and statutory rights he holds in common with the general public. The rights violations he alleges in his complaint are not unique to, and do not arise from, any "personal stake" he claims, and as such are indistinguishable from violations of the public trust in general.

Hence, what Bremner failed to demonstrate in his complaint is "such a personal stake in the outcome of the controversy as to warrant *his* invocation of the court's jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Life of the Land,* 63 Haw. at 172, 623 P.2d at 438 (citation and internal quotation marks, brackets and ellipsis omitted; emphasis in the original).

Bremner, a Kailua resident, did not allege that he lives or works in or anywhere near Waikiki. He claimed no property interest in Waikiki or its environs. He did not identify any specific, personal, aesthetic or recreational interest derogated by the zoning ordinance that may warrant standing under *Citizens* or *Life of the Land.* Nor did he assert any cultural or religious ties to the area such as those proffered by the plaintiffs in *Pele Defense Fund.* Finally, unlike the plaintiffs in *Dalton,* Bremner did not allege that future high density development in Waikiki might tangentially affect his property interests.

.Bremner is understandably chagrined that the zoning ordinance may promote development which, in his opinion, is unsound. Upon close scrutiny, however, his grievance is fundamentally a difference of opinion between a concerned citizen and his elected representatives in government. We note that in *Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276, 284, 768 P.2d 1293, 1299 (1989), the supreme court stated that "[w]e abhor the use of courtrooms as political forums to vindicate individual value preferences[,]" such as those advanced by Bremner.

■■■■ While Bremner evidently harbors a deep-seated intellectual and emotional attachment to Waikiki and an equally devout belief in the wisdom of the original special district regulations, and in that sense and that sense only feels a sense of ownership, the soundness of his ideas must ultimately be judged by the electorate and its representatives on the City Council, and not by the courts. "The proper forum for the vindication of a value preference is in the legislature, the executive, or administrative agencies, and not the judiciary. For it is in the political arena that the various interests compete for legal recognition..... [A] special interest in the problem, by itself, would not be sufficient to confer standing." *Id.* at 283–84, 768 P.2d at 1299. *See also Mottl,* 95 Hawai'i at 391–92, 23 P.3d at 726–27.

We acknowledge the expansive trend in modern standing jurisprudence we outlined above, and our "basic position ... that standing requirements should not be barriers to justice." *Life of the Land,* 63 Haw. at 174, 623 P.2d at 439 (footnote omitted). All the same, not one of the cases we cited in order to exemplify the trend dispensed with the desideratum of a "personal stake" or "injury in fact" in the controversy *sub judice. See Mottl,* 95 Hawai'i at 393, 23 P.3d at 728 (observing that the "injury in fact" standing requirement has not been abandoned, even in the face of "lowered standing barriers in cases of public interest" (brackets, citation and internal quotation marks omitted)). And

---

2. The generalized harms argued by Bremner in his opening brief are noted here merely for illustrative purposes, since our review must ultimately be restricted to the allegations in Bremner's complaint.

as we parenthetically noted in citing each case, the plaintiffs therein did demonstrate the derogation of a specific, personal right or privilege. None of those cases involved so vaporous an interest as the wholly abstract and fundamentally academic debate about land use policy here involved. *See id.*, at 395, 23 P.3d at 730 ("the plaintiffs have failed to demonstrate that they suffered an injury to a recognized interest, as opposed to merely airing a political or intellectual grievance" (citation and internal quotation marks omitted)); *Akinaka*, 91 Hawai'i at 55, 979 P.2d at 1081 ("the plaintiff must show a distinct and palpable injury to himself or herself. The injury must be distinct and palpable, as opposed to abstract, conjectural, or merely hypothetical" (brackets, citations and internal quotation marks omitted)).

In so holding, we are also confident that our application of the principles of standing in this case in no way runs afoul of the legislative declaration of policy contained in HRS ch. 632. *See Life of the Land*, 63 Haw. at 172 n. 5, 623 P.2d at 438 n. 5. Because Bremner fails to allege a judicially cognizable injury, we cannot say that an "actual controversy exists between contending parties" that would qualify Bremner for declaratory relief, any more than we can say that citizens often disagree with actions taken by their elected representatives. HRS § 632–1. The same reason prevents us from being "satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation[.]" *Id.* Nor can we be convinced that Bremner "asserts a legal relation, status, right, or privilege in which [he] has a concrete interest[,]" absent a specific allegation of personal and particularized harm. *Id.* To be sure, regardless of whether the zoning ordinance is voided or not, the City Council may pass other land use ordinances for Waikiki. Bremner, or others, may very well disagree with the sagacity of those ordinances as well. Such debates over public policy are a sign of a healthy democracy, and will not and should not end. Hence, ultimately, we cannot say with any assurance that a declaratory judgment in this case "will serve to terminate the uncertainty or controversy giving rise to the proceeding." *Id.*

We recognize that HRS ch. 632 is to be "liberally interpreted and administered, with a view to making the courts more serviceable to the people[,]" HRS § 632–6, but nowhere does the law suggest that this admonition trumps the standing requirement of a "personal stake" or an "injury in fact." The specific harm which our standing doctrine requires, and which Bremner failed to allege, by no means interposes an excessive burden upon plaintiffs who seek the services of the courts. Rather, the requirement ensures that judicial intervention will be within the particular capabilities of the courts, and be not constitutional folly. *Life of the Land*, 63 Haw. at 171–72, 623 P.2d at 438.

Finally, we reaffirm our overarching principle in matters of standing, that "[o]ur touchstone remains the needs of justice." *Id.* at 176, 623 P.2d at 441 (citation and internal quotation marks omitted). Those needs are by no means thwarted by terminating Bremner's cause at the present juncture. Dismissal of his complaint does not foreclose judicial review of actual developments that may be contemplated and proposed in the future under the zoning ordinance, provided that the plaintiff in any future suit is properly positioned to assert standing.

### 2. The Issue of Ripeness.

In his complaint, Bremner alleged that the zoning ordinance violates his due process and equal protection rights because it fails to comply with the City's general plan, contains vague and arbitrary language, and promotes discriminatory application. Bremner did not plead any specific context for these claims. We believe that, until there is actual implementation of the zoning ordinance in the form of a specific development project proposed or approved under the ordinance, none of these constitutional challenges is ripe for adjudication.

As a general rule, courts must "carefully weigh the wisdom, efficacy, and timeliness of an exercise of their power before acting, especially where there may be an intrusion into areas committed to other branches of government." *Life of the Land*, 63 Haw. at 172, 623 P.2d at 438. Our con-

cern about infringing upon the authority of our elected brethren becomes particularly acute whenever a challenge to legislation predates efforts to implement its provisions. "[P]rudential rules of judicial self-governance founded in concern about the proper—and properly limited—role of courts in a democratic society[,]" *id.* (citations and internal quotation marks omitted), considerations flowing from our coequal and coexistent system of government, dictate that we accord those charged with drafting and administering our laws a reasonable opportunity to craft and enforce them in a manner that produces a lawful result. To do otherwise risks divesting the other branches of government of their fundamental constitutional prerogatives.

 Hence, the established, general practice of the courts has been to reserve judgment upon a law pending concrete executive action to carry its policies into effect:

> The need to avoid premature adjudication supports a definition of "dispute" that requires more than a "difference of opinion" as to policy. The rationale underlying the ripeness doctrine and the traditional reluctance of courts to apply injunctive and declaratory remedies to administrative determinations is "to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."

*Grace Business Dev. Corp. v. Kamikawa*, 92 Hawai'i 608, 612, 994 P.2d 540, 544 (2000) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)).

 The ripeness doctrine is moreover informed by the proposition that "rights, constitutional and otherwise, do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interests, and their contours are shaped by the interests they protect." *State v. Hoang*, 86 Hawai'i 48, 59, 947 P.2d 360, 371 (1997) (brackets, citations and internal quotation marks omit-

ted). Accordingly, "one who would challenge the constitutional validity of a statute must show that *as applied to him* the statute is invalid. Constitutional rights may not be vicariously asserted." *Kaneohe Bay Cruises, Inc. v. Hirata*, 75 Haw. 250, 265, 861 P.2d 1, 9 (1993) (brackets, citation and internal quotation marks omitted; emphasis in the original).

 Viewed in this light, it becomes apparent that implementation of the zoning ordinance is an indispensable precondition of judicial intervention prefaced upon an alleged due process or equal protection violation. While future application of the zoning ordinance may indeed run afoul of constitutional safeguards, we find it equally possible that, given reasonable care, the opposite outcome may obtain. It is thus an open question whether the City will ultimately administer the ordinance in an arbitrary and discriminatory fashion when approving or rejecting future development in Waikiki, or whether implementation of the zoning ordinance will sanction development in contravention of the City's general plan. Given the speculative nature of such concerns, we cannot but conclude that the matter is not ripe for adjudication.

### 3. The Environmental Assessment Issue.

 In his complaint, Bremner contended that the zoning ordinance is invalid because it was enacted without benefit of an environmental assessment. We perceive that this claim, if potentially valid, was in any case brought in an untimely manner.

For this contention, Bremner relied, in his complaint, upon HRS ch. 343, generally and without further specificity. We observe that HRS § 343-5(a)(5) (1993) provides, in pertinent part, that "an environmental assessment shall be required for actions which ... [p]ropose any use within the Waikiki area of Oahu, the boundaries of which are delineated in the land use ordinance as amended, establishing the 'Waikiki Special District[.]'"

We question the applicability of this provision to the City Council's promulgation of the zoning ordinance. HRS § 343-2 (1993) defines "action" as "any program or project to

be initiated by any agency or applicant"; "agency" as "any department, office, board, or commission of the state or county government which is a part of the executive branch of that government"; and "applicant" as "any person who, pursuant to statute, ordinance, or rule, officially requests approval for a proposed action."

In any event, we observe that HRS § 343–7(a) (1993) requires a plaintiff, who wishes to challenge a party's failure to perform an environmental assessment, to file a complaint "within one hundred twenty days of the agency's decision to carry out or approve the action, or, if a proposed action is undertaken without a formal determination by the agency that a statement [environmental impact statement] is or is not required, ... within one hundred twenty days after the proposed action is started."

The City Council passed the zoning ordinance on December 4, 1996. Bremner filed his complaint on March 5, 1998, over a year after the zoning ordinance took effect and far in excess of the time limit prescribed by even a most lenient reading of HRS § 343–7.[3]

*B. The Development Plan Ordinance.*

In his complaint, Bremner took issue with the City Council's decision to adopt the development plan ordinance on the same day that amendments to the bill were added. Bremner contended that this violated Rule 18.6 of the City Council's internal rules of procedure, which provides that

[a]nything to the contrary notwithstanding, a bill or resolution up for third and for final reading which has been the subject of

3. In his complaint, Bremner asserts that the omission of an environmental assessment violated his environmental rights under article XI, section 9 of the Hawai'i Constitution. The manner in which Bremner's rights under article XI may be enforced, however, is governed by section 9's qualification that any such legal proceeding be "subject to reasonable limitations and regulation as provided by law." Haw. Const. art. XI, § 9. Because Hawai'i Revised Statutes ch. 343 provides reasonable limitations and regulations for adjudicating disputes involving environmental assessments, Bremner's failure to comply with its provisions forecloses further consideration of his constitutional claim.

4. We observe that section 3–202 of the Revised Charter of the City & County of Honolulu (RCH)

a floor amendment, shall not be acted upon on said date, and final action shall be delayed for at least forty-eight hours.

Rules of the Council of the City & County of Honolulu (RCCCH) (1995).

Bremner reasoned that delaying a final vote on the amended bill, as prescribed by RCCCH Rule 18.6, would have given him an opportunity to express his views on the amendments, a right that he believes is protected under the free speech provisions of the federal and State constitutions.

We decide that Bremner's argument lacks merit. Prior to voting on the development plan ordinance, the City Council unanimously suspended RCCCH Rule 18.6. From a transcript of the November 13, 1996 meeting of the City Council, concerning the bill embodying the development plan ordinance:

[COUNCIL CHAIR:] Any objections into [*sic*] waiving of the 48–hour Ruling? Chair sees no objections from the nine members present. So ordered.

The Council was authorized to do so pursuant to RCCCH Rule 26 (1995), which provides that,

[u]nless superseded or prohibited by state or city law, these Rules may be suspended by the affirmative vote of two-thirds of the entire membership of the Council.

We are unable to discover, and Bremner himself is unable to cite, any State statute or City ordinance that generally requires a floor-amended bill up for third and final reading before the City Council to lay over for forty-eight hours prior to a final vote.[4]

(1994), entitled "Introduction, Consideration and Passage of Ordinances and Resolutions[,]" dictates the procedures under which ordinances and resolutions are to be considered by the City Council. While section 3–202 imposes a minimum one-week layover time for "[r]esolutions authorizing proceedings in eminent domain[,]" the section does not contain a corollary layover requirement for ordinances on any subject. Indeed, layover of an amended ordinance generally requires affirmative action by members of the City Council. RCH § 3–202(3) ("[o]n the demand of at least four members, any bill shall, after amendment, be laid over for one week before its final reading").

■ In any case, we are generally loath to void otherwise valid actions of a separate and coequal branch of government simply because that branch may have violated its own internal rules. In *Territory v. Dondero*, 21 Haw. 19 (1912), the supreme court announced the general proposition—then already well-established—that

a municipal board may waive or suspend its rules of procedure. Such waiver may be brought about either by formal action on the part of the board or by ignoring of the rules without objection. If an ordinance is passed without violation of statutory requirements, but in violation merely of a rule of procedure, it will not be held invalid for that reason.

*Id.* at 22 (citations omitted). *See also Schwab v. Ariyoshi*, 58 Haw. 25, 39, 564 P.2d 135, 144 (1977) (in an action seeking to invalidate a statute because, *inter alia*, it was passed in violation of rules enacted by the State senate and house of representatives, holding that in the absence of a constitutional violation, "the alleged violations of its own legislative rules remain the province of the legislature itself" (citation omitted)).

It would seem incongruous in this case that the City Council's internal rules of procedure, having no force of law, could occasion judicial invalidation. *See* RCH § 3–201 (1994) ("[e]very legislative act out of the council shall be by ordinance. Non-legislative acts of the council may be by resolution, and except as otherwise provided, no resolution shall have force or effect as law"). Doing so seems particularly gratuitous in this instance, where a simple majority of the City Council could have completely rescinded, rather than suspended, RCCCH Rule 18.6 before taking action on the development plan ordinance. RCCCH Rule 25 (1995) ("[a] rule of the Council may be altered or rescinded and a new rule may be adopted by a resolution approved by an affirmative vote of a majority of the entire membership of the Council at an open meeting"); RCH § 3–202(6) (1994) ("resolutions may be adopted on one reading").

■ Turning to Bremner's free speech argument, apart from constitutionally-derived free speech protections, Bremner's "right to petition his government" is granted limited statutory protection. HRS ch. 92, commonly known as the "Sunshine Law," is intended to foster transparency in the formation and conduct of public policy by "[o]pening up the governmental processes to public scrutiny and participation[.]" HRS § 92–1 (1993). In furtherance of this end, the chapter directs governmental entities such as the City Council to afford all interested persons notice and an opportunity to comment orally or in writing on formal topics of discussion at all nonexempt public meetings. HRS § 92–3 (1993). Persons alleging a violation of this provision must file a complaint within ninety days of the violation. HRS § 92–11 (1993).

Bremner does not complain that he was prevented from testifying at the November 13, 1996 council meeting. According to the meeting transcript, seven speakers did testify. Bremner either did not attend or chose not to speak at the meeting. His complaint indicates, however, that he testified at numerous meetings concerning the development plan ordinance during the period of its consideration by the City Council.

■ In any event, Bremner's opportunity to file a complaint alleging a HRS ch. 92 violation has long since passed. The City Council enacted the development plan ordinance on November 13, 1996. Bremner filed his complaint on March 5, 1998, well over a year after the ordinance's passage and far in excess of the ninety-day deadline imposed by HRS § 92–11.

Apart from this statutory framework, we perceive nothing in free speech jurisprudence which independently suggests that the City Council has a constitutional obligation to listen to Bremner's opinions.

## IV. Conclusion.

Accordingly, the April 26, 1999 judgment of the circuit court of the first circuit is affirmed.